Application of CONTICOMMODITY
SERVICES INC.,
Petitioner-Appellee,

for an Order restraining arbitration
attempted to be had by

PHILIPP & LION, Respondent-Appellant.

No. 554, Docket 79–7655.

United States Court of Appeals,
Second Circuit.

Argued Dec. 20, 1979.

Decided Jan. 15, 1980.

Alexander R. Sussman, New York City (Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel and assisted by Jonathan S. Margolis, New York City (not yet admitted to the Bar)), for respondent-appellant.

Thomas A. Dubbs, New York City (Chadbourne, Parke, Whiteside & Wolff, New York City, Daniel J. O'Neill, Steven S. Weiss, New York City, of counsel), for petitioner-appellee.

Before SMITH, FEINBERG and TIMBERS, Circuit Judges.

FEINBERG, Circuit Judge:

The issue in this case is whether a court or an arbitrator should decide the timeliness of a demand for arbitration. Philipp & Lion (Philipp), the party seeking arbitration, appeals from an order of the United States District Court for the Southern District of New York, Kevin T. Duffy, J., that granted the petition of appellee Conticommodity Services Inc. (Conti) to stay Philipp's demand for arbitration and denied Philipp's cross-motion to compel arbitration under section 4 of the Federal Arbitration Act, 9 U.S.C. § 4. The judge held that it was proper for the district court to decide the issue and that Philipp's demand for arbitration was time-barred. For reasons stated below, we reverse the judgment of the district court and grant Philipp's cross-motion to compel arbitration.

1. The relevant section of the Customer's Agreement provides:

10. Any controversy between us arising out of or relating to this contract or the breach thereof shall be settled by arbitration in accordance with the rules then obtaining of the American Arbitration Association or the Arbitration Committee of any Exchange on which any order involved therein may have been executed or in which you shall have the benefit of membership. Arbitration must be commenced within one year after the cause of action has accrued by service upon the other of a written demand for arbitration, naming therein the arbitration tribunal.

2. The relevant section of the COMEX rules provides:

Section 232. Except as otherwise provided in the By-Laws or Rules of the Exchange, the following claims, disputes, differences or controversies shall be submitted for arbitration in accordance with the Rules Governing Arbitration:

(a) A claim, dispute, difference or controversy between parties who are members of the Exchange or which are member firms of the Exchange or were such at the time of the

I

Philipp is an English partnership that trades in metals, and Conti is a domestic commodities broker. In 1974, Philipp opened an account with Conti for the trading of metals futures contracts. A written Customer's Agreement between Philipp and Conti provided for the arbitration of "[a]ny controversy . . . arising out of or relating to" the trading contract between the parties, with the additional provision that arbitration was to commence within one year of the accrual of any such cause of action.[1] Philipp and Conti are also both members of the Commodities Exchange Inc. (COMEX) and as such are governed by the rules promulgated by COMEX. One such rule provides for the arbitration of any "claim, dispute, difference or controversy [between COMEX members] wholly or partially arising, directly or indirectly, out of, in connection with, or as a result of, any transaction in a commodities futures contract."[2] Although the original version of the COMEX rule did not establish a time limitation for the commencement of arbitration, a 1977 amendment imposed a one-year time limitation.[3]

transaction or other event upon which the matter is based

(i) wholly or partially arising, directly or indirectly, out of, in connection with or as the result of, any transaction in a commodity futures contract made on the Exchange . .

3. The limitation added to the rules in 1977 provides:

Rule 702. A party desiring to initiate an arbitration proceeding, within one year of the date of the transaction or event which gave rise to the claim or grievance, shall file with the Secretary a concise statement of claim or controversy, together with a copy of an agreement to arbitrate disputes under the rules of the Exchange, if such an agreement exists, or a copy of a court order directing such an arbitration and the moving papers upon which such order was made if the proceeding is instituted pursuant to such an order; or if such party is not a member of the Exchange, a statement that such party elects to have the claim or controversy arbitrated before the Exchange, together with a statement pursuant to By-Law Section 232(b)(iii); a statement that such party wishes to have

Several months after the parties entered into their agreement, a dispute arose over Conti's handling of Philipp's account, and, as a result, Conti ceased acting as Philipp's broker in late 1974. The parties attempted to settle their disagreement, but in September 1978 Philipp, claiming it was owed $750,000, served Conti with a demand for arbitration before COMEX. Conti applied in the Supreme Court, New York County, for an order staying arbitration on the ground that Philipp's demand was untimely under their agreement. Philipp removed the action to the federal district court, and then cross-moved under section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, for an order compelling arbitration.

In the district court, Conti argued that Philipp's demand for arbitration was untimely under the one-year limitation incorporated into the parties' agreement. Philipp responded that the timeliness of its demand for arbitration was an issue that should be determined by an arbitrator rather than by the court. Phillip also argued that even if the issue was properly before the court, the demand for arbitration was nonetheless timely under the agreement and the COMEX rule. As already indicated, Judge Duffy rejected Philipp's arguments and held that the issue of timeliness was properly before the court and that Philipp's demand for arbitration was untimely. The judge recognized that the key question before him was whether a court, rather than an arbitrator, could properly decide that "the period of limitation contained in an arbitration clause had run." The judge was also "of the opinion," in the words of 28 U.S.C. § 1292(b), that his order involved "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal" from his order might "materially advance the ultimate termination of the litigation." Accordingly, the judge certified an interlocutory appeal pursuant to that section, and a panel of this court permitted the appeal to be taken.

the matter heard by an arbitration panel, a majority of the members of which are not members of or associated with any member of the Exchange, or employees thereof, and

## II

When one party to a dispute seeks to stay the other party's demand for arbitration by raising various defenses to arbitration before a district court, there is a considerable temptation for the court to pass on the validity of such defenses rather than to refer their resolution to an arbitrator. Determining the merits of such defenses may often appear to be a simple task that should not be delayed or deferred, and judges are, by training and temperament, prepared to decide the issues that come before them. Furthermore, there is inevitably some judicial hostility toward the view that a court is deprived of jurisdiction over procedural questions simply because the parties have agreed to arbitrate disputes.

These reactions, while understandable, are at odds with the policy considerations embodied in the Federal Arbitration Act, which favor the enforcement of arbitration agreements. Arbitration is intended to provide the parties to a dispute with a speedy and relatively inexpensive trial before specialists. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Hanes Corp. v. Millard*, 174 U.S.App.D.C. 253, 265–66, 531 F.2d 585, 597–98 (D.C.Cir.1976). Use of the arbitral device, it should also be noted, simultaneously eases the workload of the courts. Presumably in order to prevent the easy frustration of these goals, the Federal Arbitration Act carefully limits the role of courts in considering motions to compel arbitration. Section 4 of the Act provides in pertinent part that

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement.

who are not otherwise associated with the Exchange (hereinafter a "mixed panel"); and a check in payment of the arbitration fee calculated pursuant to Rule 707(a).

. . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

The statutory language is straightforward; unless the "making" of the agreement to arbitrate or "the failure, neglect, or refusal" of one party to arbitrate is in dispute, the court must compel arbitration.

 In the present case, the existence of an arbitration agreement and Conti's refusal to arbitrate its controversy with Philipp are both undisputed. Accordingly, it would appear that the district court was required under section 4 to send the dispute to arbitration, regardless of the validity of any procedural defenses, such as untimeliness, that Conti might assert against Philipp's demand for arbitration. The district court nonetheless denied Philipp's cross-motion under section 4 to compel arbitration. The court did not address the express terms of that section, but reasoned that it need not compel arbitration if it found that the agreement was no longer "viable" due to the untimeliness of Philipp's demand for arbitration. In support of its authority to determine the validity of Conti's time-bar defense to arbitration, the district court cited our prior decision in *Reconstruction Finance Corp. v. Harrisons & Crosfield*, 204 F.2d 366 (2d Cir.), cert. denied, 346 U.S. 854, 74 S.Ct. 69, 98 L.Ed. 368 (1953), and distinguished our later holding in *Trafalgar Shipping Co. v. International Milling Co.*, 401 F.2d 568 (2d Cir. 1968). In his subsequent certification to this court, however, Judge Duffy noted that there was substantial uncertainty concerning the interpretation of these decisions. We agree that some ambiguity exists, but find that *Reconstruction Finance* and *Trafalgar Shipping*, when read in light of the language of section 4 and the policy considerations underlying the Feder-

al Arbitration Act, support the view that the validity of time-bar defenses to the enforcement of arbitration agreements should generally be determined by the arbitrator rather than by the court.

In *Reconstruction Finance*, the plaintiff sought to enjoin defendant's demand for arbitration of a claim of damages resulting from the failure of plaintiff's predecessor to obtain insurance on certain rubber shipments that were destroyed in 1942. Since defendant had not requested arbitration until 1951, the plaintiff argued that the demand was untimely under the relevant six-year statute of limitations governing contract obligations. District Judge Weinfeld denied plaintiff's petition to stay arbitration, noting that under the language of section 4 the court was precluded from passing on the validity of plaintiff's time-bar defense. *Application of Reconstruction Finance Corp.*, 106 F.Supp. 358, 361–62 (S.D.N.Y.1952). In affirming, this court assumed arguendo that defendant would be barred by the six-year statute of limitations from recovering damages for plaintiff's breach of its contractual obligation to obtain insurance. Nevertheless, we concluded that the "effect of the limitations statute on the asserted obligations to obtain insurance will be determined by the arbitrators." 204 F.2d at 369. The district court's role was limited to determining whether the statute of limitations had expired on defendant's right to seek judicial enforcement of the arbitration agreement. The motion to compel arbitration in *Reconstruction Finance* was timely since it had been brought well within six years after plaintiff breached the arbitration agreement by refusing to arbitrate.

The opinion in *Reconstruction Finance* went on to note in dictum that in some circumstances the untimeliness of the original demand for arbitration, as opposed to the motion to compel arbitration, might bar judicial enforcement of the agreement to arbitrate; thus, the equitable doctrine of laches might bar enforcement of a demand for arbitration if that demand was made long after the dispute arose. 204 F.2d at

369–70. The court also observed that parties could avoid being forced to arbitrate ancient disputes by simply inserting an "express time limitation" within the arbitration agreement. 204 F.2d at 370. The opinion did not say, however, whether the running of such an express limitation would be determined by the court or the arbitrator.

Fifteen years later, we again considered in *Trafalgar Shipping* whether a court could properly invoke the doctrine of laches to bar enforcement of a demand for arbitration. Petitioner Trafalgar had requested arbitration some five years after a dispute with respondent International arose. The latter refused to arbitrate and Trafalgar brought a suit to compel arbitration. The district court, on the authority of *Reconstruction Finance*, considered International's defense of laches and held that the demand for arbitration of the underlying dispute was untimely. This court reversed, noting that while the actual holding of *Reconstruction Finance* was somewhat obscure, a proper interpretation of the decision required that "all questions of delay which relate to issues which the parties have agreed to submit to arbitration . . . be resolved by the arbitrators, not the court." 401 F.2d at 571. We recognized that the panel in *Reconstruction Finance* had suggested that the question of laches might be for the court in some circumstances. However, we construed these circumstances narrowly; a court could determine only those questions of delay that relate to the two issues it is required to decide under section 4 of the Act—the making of an arbitration agreement and the failure, refusal, or neglect to arbitrate. "If one of these issues is disputed before the court,

and if one party claims that its ability to present proof in relation thereto has been prejudiced through the delay of the other, the court may consider whether it is fair to permit the dilatory party even to invoke its processes under the Act." Id. Any other questions of delay, unless expressly reserved for court determination by the arbitration agreement, were properly left "to the expertise of the arbitrators." 401 F.2d at 572.[4]

We believe that this analysis controls disposition of this appeal. There is no claim here of delay affecting the two issues the district court could properly decide. It is undisputed that there was an agreement to arbitrate and that Conti has refused to do so. The dispute instead concerns whether Philipp's original demand to arbitrate its dispute with Conti was time-barred under the one-year provision in the parties' private agreement or under the COMEX rule. Under the cases already discussed, this question is within the exclusive province of the arbitrator. Cf. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 555–59, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). This does not mean that the one-year limitation period in the contract is meaningless, since there is no reason to assume that an arbitrator will ignore any provision of the agreements that bind the parties. It does mean that the arbitrator, not the court, should determine the effect of the one-year limitation, including the validity of Philipp's arguments that it does not bar arbitration on these facts.[5]

Conti attempts to evade the import of *Reconstruction Finance* and *Trafalgar Shipping* by arguing, first, that its refusal to arbitrate the dispute was "rightful" because Philipp's demand for arbitration was

---

4. We also cited with approval *Lowry & Co. v. S.S. LeMoyne D'Iberville*, 253 F.Supp. 396 (S.D. N.Y.1966), appeal dismissed, 372 F.2d 123 (2d Cir. 1967).

5. As Philipp's briefs on appeal make clear, determining whether its demand for arbitration was timely is not a simple task. First, it is far from certain whether the COMEX rule or the Customer's Agreement governs the issue of timeliness. Furthermore, if the COMEX rule applies, it is unclear whether the one-year limitation incorporated into the rule in 1977 is

applicable to a demand for arbitration of a dispute that arose before that date. Finally, regardless of which provision governs the issue of timeliness, factual determinations must be made before the question can fairly be decided; e. g., when "the cause of action . . . accrued." We note these issues only to emphasize the appropriateness of referring such matters to "the expertise of the arbitrators" when the parties have broadly agreed to arbitrate their disputes.

untimely. However, under our prior decisions, a court under section 4 is limited to determining whether a party refused to arbitrate, not whether it rightfully refused. See *World Brilliance Corp. v. Bethlehem Steel Co.*, 342 F.2d 362, 364–65 (2d Cir. 1965); *Trafalgar Shipping*, supra, 401 F.2d at 572. A contrary conclusion, permitting the court to evaluate the "rightfulness" of a party's refusal to arbitrate, would be at odds with the limited scope of judicial inquiry authorized by section 4.

█ Conti also contends that the express time limitation embodied in its private agreement specifically reserved the question of timeliness for the court and cites our decisions in *Reconstruction Finance* and *Trafalgar Shipping* for support. It is true that both decisions noted that parties could avoid the arbitration of disputes occurring long before by inserting an "express time limitation" within the arbitration agreement. Neither opinion, however, suggested that the running of such a limitation was to be determined by the court. In the absence of express language in the contract referring to a court questions concerning the timeliness of a demand for arbitration, the effect of a time limitation embodied in the agreement is to be determined by the arbitrator. In the present case, neither the private agreement nor the COMEX rule embodies any such express language. As indicated above, the one-year time limitation retains vitality even though its interpretation and enforcement occur in the arbitral, rather than in the judicial, forum.[6]

Accordingly, the stay of arbitration is vacated and the appellant's cross-motion to compel arbitration is granted.

DRAVO CORPORATION, Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Ray Marshall, Secretary of Labor, Respondents.

No. 79–1435.

United States Court of Appeals,
Third Circuit.

Nov. 13, 1979.

Decided Jan. 14, 1980.

---

6. Such a definite limitation period, moreover, eliminates the more difficult questions raised by the defense of laches; e. g., prejudice, unreasonableness of delay.

**1228**

Charles R. Volk (argued), Jane A. Lewis, Thorp, Reed & Armstrong, Pittsburgh, Pa., for petitioner.

Ann D. Nachbar (argued), Ronald R. Glancz, Allen H. Feldman, Acting Counsel for Appellate Litigation, Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Nancy L. Southard, Acting Asst. Counsel for Appellate Litigation, U. S. Dept. of Labor, Washington, D. C., Marshall H. Harris, Regional Sol., U. S. Dept. of Labor, Philadelphia, Pa., for respondents.

Before SEITZ, Chief Judge, ALDISERT, Circuit Judge, and HUYETT, District Judge.*

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major questions for decision in this petition for review of a final order of the Occupational Safety and Health Review Commission under 29 U.S.C. § 660(a) require us to decide whether the commission correctly determined the applicability of maritime standards, as well as general industry standards, to the structural shop of Dravo's Engineering Works Division, Neville Island, Pittsburgh, Pennsylvania. The administrative law judge determined that maritime standards were appropriate because the majority of the work performed in the structural shop involved the forming, welding and fitting of vessel components and was therefore "related" to "shipbuilding" as those terms are defined in Safety and Health Regulations for Shipbuilding, 29 C.F.R. § 1916.2 (1978). He issued a decision and order which also affirmed in relevant part citations issued by OSHA compliance officers, seven items of which form a separate basis of this petition for review. Dravo petitioned the commission for discretionary review of the report of the ALJ, but when no commissioner directed review, the ALJ's order became the final order of the commission by operation of law. 29 U.S.C.

---

* Honorable Daniel H. Huyett, 3rd, of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

§ 661(i). Dravo's petition to this court followed. We hold that the OSHA shipbuilding regulations do not, by their express terms, apply to a structural shop such as Dravo's. Because we are not inclined to expand the scope of the regulations beyond that expressed by the Secretary, we will grant the petition for review and set aside that part of the commission's order holding Dravo's structural shop to be subject to shipbuilding standards.

## I.

The Engineering Works Division of Dravo Corporation is engaged in the year-round manufacture of heavy equipment including barges and towboats, raw material processing machinery, material handling equipment and major components for dams, locks and power plants. The division is on a sixty-eight acre worksite on Neville Island in the Ohio River, about six miles from Pittsburgh. Plant facilities include a 1,800 foot-long waterfront on the Ohio River, a barge shop where vessels are assembled at a rate of over three per week, trade shops where vessels are outfitted, and the structural shop.

Dravo's structural shop is a general fabrication shop in which metal plates are formed, sized, and welded. The operations of the structural shop, as in any general industry fabrication shop, include processes by which metal is formed with the use of press brakes, shears, angle rolls, punch and coping machines, burning machines and welders. These plates are used in the assembly of all of Dravo's major products. Those that are to become parts of vessels are carried by railroad car from the shop on the southern side of the island across the public road that bisects the island and the plant to the boat yard area on the northern side of the island where the vessels are assembled and eventually launched. At least one barge has been assembled in the structural shop. App. at 224a–26a. Faced with this evidence, including testimony that in 1977, "51 percent of the work in the Structural Shop was marine related, that is, the product went into a boat or a barge,"

while "[t]he balance of the work involved material handling machinery [27%], pelletizing machines, gait hoists [20%] and spare parts [remaining per cent]," App. at 225a, 1034a–35a, the ALJ determined that maritime standards applied to activities in that shop.

The test adopted by the ALJ appears to be that if the major part of the work in a shop at a given time is "shipbuilding" by definition of OSHA regulation 29 C.F.R. § 1916.2(i), that is, "the construction of a vessel, including the installation of machinery and equipment," then the shipbuilding safety standards will apply. In announcing this formula he rejected the approach taken in another proceeding involving Dravo Corporation at OSHRC Docket No. 14818. *Dravo Corp.*, [1976–77] OSH Dec. (CCH) ¶ 20,787 (1976). There, in determining the appropriate standards for Dravo's pipe shop, the ALJ concluded that even though ninety per cent of the pipe shop's production was incorporated into vessels, shipbuilding standards should not apply. Relying on a Fourth Circuit decision subsequently overturned by the Supreme Court, he determined that the applicability of those standards should be limited to shipbuilding and related activities between the ship and the last "point of rest" of equipment. Dravo has thus been confronted in separate OSHRC proceedings with divergent formulations for determining what areas are to be held to shipbuilding safety standards under OSHA.

## II.

The central purpose of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . ." 29 U.S.C. § 651(b). The Act authorizes the Secretary of Labor "to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce," and created the Occupational Safety and Health Review Commission "for carrying out adjudicatory functions [of the Act]." 29 U.S.C.

§ 651(b)(3). Each statutory employer is placed under a duty to comply with the promulgated standards. 29 U.S.C. § 654(a)(2). Normally, the Secretary's standard-setting authority is to be exercised as the product of notice and comment rulemaking. 29 U.S.C. § 655(b). Within the first two years after the effective date of the Act, however, because of concern that the Act be implemented as soon as possible, Congress authorized the Secretary to "promulgate as an occupational safety or health standard . . . any established Federal standard," without regard to the rule-making provisions. 29 U.S.C. § 655(a).

The term "established Federal standard" is defined as "any operative occupational safety and health standard established by any agency of the United States and presently in effect, or contained in any Act of Congress in force on December 29, 1970." 29 U.S.C. § 652(10). The Secretary had promulgated safety standards for shipbuilding prior to 1970 under the mandate of § 41 of the Longshoremen and Harbor Workers Compensation Act.[1] These regulations were formerly to be found at 29 C.F.R. § 1502 (1971). Pursuant to his authority under 29 U.S.C. § 655(a), the Secretary promulgated regulation 29 C.F.R. § 1910.14, entitled "Shipbuilding," which provides in relevant part:

(a) *Adoption and extension of established safety and health standards for shipbuilding.* The standards prescribed by Part 1502 of this title and in effect on April 28, 1971, are adopted as occupational safety or health standards under section 6(a) of the Act and shall apply, according to the provisions thereof, to every employment and place of employment of every employee engaged in shipbuilding or a related employment. Each employer shall protect the employment and places of employment of each of his employees engaged in shipbuilding or a related employment, by complying with the appropriate standards prescribed by this paragraph.

█ Thus, the OSHA shipbuilding regulations had their genesis in the LHWCA. The courts have recognized these safety regulations as part of the federal schema both to provide compensation under LHWCA to injured harbor workers in the event of an industrial accident and to prevent accidents involving harbor workers in the course of their maritime activities. *Arthur v. Flota Mercante Gran Centro Americana S. A.,* 487 F.2d 561, 564 (5th Cir. 1973); *Grigsby v. Coastal Marine Service of Texas, Inc.,* 412 F.2d 1011, 1036 (5th Cir. 1969), *cert. dismissed,* 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970). Indeed, before the maritime standards were adopted by OSHA, a violation of the safety regulations constituted negligence per se in actions by injured longshoremen against shipowners. *Arthur v. Flota Mercante Gran Centro Americana S. A.,* 487 F.2d at 564; *Marshall v. Isthmian Lines, Inc.,* 334 F.2d 131, 134 (5th Cir. 1964).[2]