820 F.2d 31
 125 L.R.R.M. (BNA) 2648, 96 A.L.R.Fed. 365,
106 Lab.Cas. P 12,387
 ASSOCIATED BRICK MASON CONTRACTORS OF GREATER NEW YORK,
INC., Petitioner- Appellee,
v.
James R. HARRINGTON, in his capacity as Secretary-Treasurer,
and John Loretoni, in his capacity as Chairman of District
Council of New York City and Long Island for the
International Union of Bricklayers and Allied Craftsmen
Locals Nos. 1, 9, 21, 30, 34, 37 & 41, an unincorporated
labor association, Respondents-Appellants.
 No. 1076, Docket 87-7140.
 United States Court of Appeals,
Second Circuit.
 Argued April 28, 1987.
Decided May 22, 1987.
 
 Roger M. Levin, New York City (Levin & Weissman, Damien E. Mysak, Kenneth P. Schneider, Ronald J. Katter, Andrew A. Gorlick, of counsel), for respondents-appellants.
 Joseph A. Fiore, Garden City, N.Y. (Albanese, Albanese & Fiore, Richard Metli, Barry A. Oster, of counsel), for petitioner-appellee.
 Before FEINBERG, Chief Judge, and KEARSE and WINTER, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 The District Council of New York City and Long Island for the International Union of Bricklayers and Allied Craftsmen Locals Nos. 1, 9, 21, 30, 34, 37 and 41 (the union) appeals from an order of the United States District Court for the Eastern District of New York, Mark A. Costantino, J., granting the petition of Associated Brick Mason Contractors of Greater New York, Inc. (Associated) to compel arbitration of certain grievances concerning an alleged manpower shortage in the greater New York masonry industry. For the reasons that follow, we affirm the district court's order compelling arbitration.
 
 I. Background
 
 2
 On July 6, 1984, after a period of negotiating a new collective bargaining agreement, the union and Associated entered into a three-year agreement (the Agreement) that continued in effect an arbitration clause. That clause provided, in part:
 
 ARTICLE VIII--ARBITRATION
 
 3
 Section 1. Except as herein otherwise provided in Article V of this Agreement, all complaints, disputes or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties or their respective members, directly or indirectly, claiming to be aggrieved, shall be submitted in writing [to arbitration in the manner set forth in the Agreement].
 
 
 4
 Section 1 of Article VIII also provided that:
 
 
 5
 Each case shall be considered on its merits and the within Collective Agreement shall constitute the basis upon which decisions shall be rendered.
 
 
 6
 Appellant union characterizes Section 1 of Article VIII, which is reproduced in full in the margin,[1] as a "rights" arbitration clause, designed to resolve disputes relating to terms or conditions of the collective bargaining agreement that arise during its term. See Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945).
 
 
 7
 Section 2 of Article VIII, which was also continued in effect, provided a procedure by which the parties could request changes in the Agreement a few months before the expiration of its three-year term. If "the terms of renewal" were not agreed upon 60 days before the termination date of the Agreement, "all terms in dispute concerning which a deadlock may exist are to be referred to an arbitration tribunal for determination" in the manner set forth in the Agreement. The union characterizes Section 2, which is also set out in full in the margin,[2] as an "interest" or "impasse" arbitration clause designed to resolve disputes leading to a new labor contract. See id. Indeed, on the same day that the parties entered into the Agreement by renewing most of its terms, including Article VIII, they apparently also avoided arbitration under Section 2 of Article VIII of the expiring labor contract, by agreeing to a Memorandum of Understanding (the Memorandum), which required them to hire a labor economist to explore whether a "manpower" shortage existed in the bricklaying industry and, if a shortage did exist, to propose remedies for the parties to discuss. The union and Associated then hired D. Quinn Mills, a labor economist, who, in a report issued in December 1984 (the Mills Report), found that there was a manpower shortage in the bricklaying industry. The Mills Report recommended, among other things, that the union and Associated enhance their training program and that they consider adopting an eight hour, straight-time workday, in place of the prevailing seven hour, straight-time workday with the eighth hour at double-time.
 
 
 8
 After discussion of the Mills Report bogged down, Anthony J. Zotollo, Associated's president, wrote to James R. Harrington, the union's secretary-treasurer, in May 1986, demanding arbitration concerning the following grievances, all dealing with the alleged manpower shortage: (1) the union's conduct in dealing with the recommendations contained in the Mills Report; (2) the union's decision to grant other employers more favorable overtime conditions; and (3) the union's delay in training apprentices. The union refused to arbitrate these disputes. In June 1986, relying on Section 1 of Article VIII, Associated filed a petition in the United States District Court for the Eastern District of New York, seeking to compel arbitration pursuant to Section 301 of the Labor Management Relations Act, 1947, 29 U.S.C. Sec. 185, and Section 4 of the Federal Arbitration Act, 9 U.S.C. Sec. 4. In a Memorandum of Decision and Order, filed January 21, 1987, and later elaborated in a Memorandum of Decision and Order, filed March 24, 1987, District Judge Mark A. Costantino directed the parties to arbitrate the grievances with due diligence. The union's appeal is now before us.
 
 II. Arbitrability
 
 9
 On appeal, the union argues that it is not required by the arbitration clause in the Agreement to arbitrate grievances relating to issues covered by the Memorandum. It also argues that Associated's petition to compel arbitration is barred by the statute of limitations, is moot because no relief is possible and is barred by the doctrine of laches. We address these arguments in turn.
 
 
 10
 To prevail in its petition to compel arbitration, Associated must establish that "(1) an arbitration agreement exists; (2) the dispute falls within the scope of the arbitration agreement ... and (3) the dispute does not involve the making of the agreement or the failure to comply therewith." Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 63 (2d Cir.1983). In this case, the union argues that the second requirement has not been met.
 
 
 11
 As a preliminary matter, we note that our scope of review is quite narrow. The existence of an arbitration clause in the Agreement raises a presumption of arbitrability that can be overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 1409 (1960)). We will order arbitration if the arbitration clause is broad and if the party seeking arbitration has made a claim that on its face is governed by the contract, even if the claim appears to be frivolous. See AT & T Technologies, Inc., 106 S.Ct. at 1419; Emery Air Freight Corp. v. Local Union 295, 786 F.2d 93, 96-97 (2d Cir.1986). If, however, the arbitration clause is narrow, and the dispute involves a collateral agreement, then "arbitration of that dispute cannot be compelled merely based upon the existence of an arbitration clause in the main agreement." Prudential Lines, Inc., 704 F.2d at 64 (citing Rochdale Village, Inc. v. Public Service Employee Union, Local No. 80, 605 F.2d 1290, 1296-97 (2d Cir.1979)).
 
 
 12
 In this case, the union faces an uphill battle in resisting arbitration. The district court correctly noted that the arbitration clause contained in section 1 of Article VIII is "a very broad" one. Except for disputes relating to Article V of the Agreement, which concerns strikes and lockouts, the clause provides for arbitration of "any acts, conduct or relations between the parties or their respective members, directly or indirectly, claiming to be aggrieved."
 
 
 13
 The union argues that the district court failed to consider "forceful evidence" of the parties' intention to limit the scope of the arbitration agreement to issues arising out of the terms and conditions of the Agreement. See AT & T Technologies, Inc., 106 S.Ct. at 1419. As evidence of this intention, the union points to an affidavit submitted by Zotollo in a prior action between the parties, in which he stated that the arbitration clause was "intended only to cover disputes and grievances arising out of the trade agreement," and stresses that all prior arbitrations under the clause related to subjects discussed in the Agreement. The union also claims that the Memorandum, which the parties executed on the same day as the Agreement, constitutes further evidence of an intention not to arbitrate Associated's grievances. The union argues that the Memorandum was executed in order to avoid the impasse arbitration provided for in Article VIII, Section 2 of the labor agreement then in force, and that the Memorandum neither contains an arbitration clause nor incorporates the arbitration clause of the Agreement.
 
 
 14
 Assuming, without deciding, that the "forceful evidence" mentioned in AT & T Technologies, Inc. may consist of evidence other than the language of the contract itself, the union's arguments do not persuade us "with positive assurance" that the parties intended to limit their arbitration agreement to the terms and conditions of the Agreement. Section 1 of Article VIII, by its express terms, covers disputes involving not only "interpretation or application of any clause" of the Agreement but also "any acts, conduct or relations between the parties ... directly or indirectly, claiming to be aggrieved." The language of this arbitration clause could hardly be broader, and Associated's grievances regarding a manpower shortage appear on their face to fall within its reach.
 
 
 15
 It is true that the grievances relate to matters growing out of the subject matter of the Memorandum, which contains no arbitration clause and was probably agreed to in order to avoid the impasse arbitration provided for in Section 2 of Article VIII of the agreement then in force. This is undoubtedly the basis of the union's claim that Associated is improperly trying to invoke the Agreement's "rights" arbitration clause (Article VIII, Section 1) to resolve disputes that are only arbitrable under the "interest" arbitration clause (Article VIII, Section 2). However, in view of the broad language of Section 1, we cannot say with positive assurance that the same issue may not be subject to arbitration under either Section 1 or Section 2, depending on the timing of the demand for arbitration. Whether the arbitration tribunal could, or should, reach the same result on the merits of that issue in view of the different wording of Sections 1 and 2 and the context in which disputes arise thereunder is not before us. Certainly, only the arbitrator can properly decide whether, as the union contends, there is no merit to Associated's grievances under Section 1 because there is no term in the Agreement that deals with the manpower shortage and the union's only obligation under the Memorandum was to "discuss and to consider the findings of the" Mills Report, which it did. Accordingly, we hold that the dispute between the parties is arbitrable.
 
 III. Statute of Limitations
 
 16
 The union and Associated also disagree over what statute of limitations period should apply to Associated's petition to compel arbitration. Oddly enough, in view of the number of arbitration matters we hear, we do not appear to have passed upon the precise issue. That issue, it should be noted, is not whether Associated's demand for arbitration was timely, which is ordinarily for the arbitrator to decide, Conticommodity Services Inc. v. Philipp & Lion, 613 F.2d 1222, 1226-27 (2d Cir.1980), but whether "the statute of limitations ha[s] expired on [the] right to seek judicial enforcement of the arbitration agreement." Id. at 1225. That right, of course, does not arise until a party "breache[s] the arbitration agreement by refusing to arbitrate." Id. See also Federation of Westinghouse Independent Salaried Unions v. Westinghouse Electric Corp., 736 F.2d 896 (3d Cir.1984).
 
 
 17
 Congress has not adopted a statute of limitations for actions brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185. Accordingly, the Supreme Court has held that "the timeliness of a Sec. 301 suit ... is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations." Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 704-05, 86 S.Ct. 1107, 1112-13, 16 L.Ed.2d 192 (1966). The question is which statute of limitations is "appropriate."
 
 
 18
 The union argues that the applicable limitations period is the federal six-month statute of limitations for unfair labor practices established by Section 10(b) of the National Labor Relations Act, 29 U.S.C. Sec. 160(b). See, e.g., International Association of Machinists and Aerospace Workers, Local Lodge No. 1688 v. Allied Products Corp., 786 F.2d 1561 (11th Cir.1986); Teamsters Union Local 315 v. Great Western Chemical Co., 781 F.2d 764 (9th Cir.1986). This position finds support in the Supreme Court's decision in DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), where the Court applied the six-month statute of limitations of Section 10(b) to a "hybrid" claim by union members against their employers for breach of collective bargaining agreements and against their collective bargaining representatives for breach of the duty of fair representation.
 
 
 19
 Associated urges this court to adopt New York's six-year limitations period governing contract actions. N.Y. Civ. Prac. L.R. Sec. 213(2). See Reconstruction Finance Corp. v. Harrisons & Crosfield, 204 F.2d 366, 369 (2d Cir.) (decided before DelCostello ), cert. denied, 346 U.S. 854, 74 S.Ct. 69, 98 L.Ed. 368 (1953). Associated argues that DelCostello should not be extended to apply to pure Section 301 actions and that the Supreme Court's decision in Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, controls. In that case, which was a straightforward suit under Section 301 for vacation pay, the Court borrowed the analogous six-year state statute of limitations.
 
 
 20
 In Robinson v. Pan American World Airways, Inc., 777 F.2d 84 (2d Cir.1985), this court stated the general rule that when a federal statute does not specify a limitations period the courts generally borrow the most analogous period under state law. We noted, however, that:
 
 
 21
 [t]he selection of a limitations period is an exercise of the court's discretionary power to fashion appropriate measures to carry out the intent of the federal legislation. Holmberg v. Armbrecht, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946). Where the state procedural rule conflicts with the substantive purposes of the federal cause of action, however, courts have not hesitated to deviate from this rule of thumb. See, e.g., Occidental Life Insurance Co. v. EEOC, 432 U.S. 355, 367, 97 S.Ct. 2447, 2454, 53 L.Ed.2d 402 (1977) (state limitations period rejected for Title VII claim brought by EEOC).
 
 
 22
 777 F.2d at 86. Because we find that application of New York's six-year limitations period for contract actions would conflict with the substantive purposes of federal labor law, we hold that the six-month statute of limitations under Section 10(b) of the National Labor Relations Act applies to actions to compel a labor arbitration.
 
 
 23
 Six years is simply too long to allow industrial disputes to fester. See Robinson, 777 F.2d at 89 ("speedy settlement" of dispute arising out of "labor-management relationship ... is highly desirable"). The Court in DelCostello recognized that federal labor policy relied heavily on "grievance, arbitration, and the 'law of the shop,' [and] could easily become unworkable if a decision ... could suddenly be called into question ... years later." 462 U.S. at 169, 103 S.Ct. at 2293 (quoting United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 64, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1981)). By contrast, a six-month statute of limitations will encourage the prompt resolution of grievances. Six months sets "the proper balance between the national interests in stable bargaining relationships and finality of private settlements," DelCostello, 462 U.S. at 171, 103 S.Ct. at 2294 (quoting Mitchell, 451 U.S. at 70, 101 S.Ct. at 1568 (Stewart, J., concurring)), and a party's interest in invoking the arbitral process under the collective bargaining system. Also, because many grievances involve activity that may also constitute an unfair labor practice under the National Labor Relations Act, it makes sense to have a common statute of limitations for claims arising under Section 10(b) and actions to compel arbitration. See Westinghouse, 736 F.2d at 902.
 
 
 24
 Associated argues that application of a federal statute of limitations to actions to compel arbitration is inconsistent with decisions from other circuits that apply relatively long state statutes of limitations to actions to enforce arbitration awards. See Derwin v. General Dynamics Corp., 719 F.2d 484 (1st Cir.1983); International Union of Electrical, Radio and Machine Workers v. Ingram Mfg. Co., 715 F.2d 886 (5th Cir.1983), cert. denied, 466 U.S. 928, 104 S.Ct. 1711, 80 L.Ed.2d 184 (1984). We do not agree. A dispute between a union and an employer remains completely unsettled between the time a grievance arises and the time a petition to compel arbitration is filed. By contrast, there is little or no uncertainty concerning the status of a grievance after an arbitrator issues an award and before an action to enforce that award is filed. See Westinghouse, 736 F.2d at 901, 902 & n. 4. In both situations, the limitations period chosen is appropriate because it promotes industrial harmony and maintains the integrity of the arbitral process.
 
 
 25
 The union next argues that Associated's petition to compel arbitration, filed in June 1986, was untimely under the applicable six-month statute of limitations. As already indicated, it is well established that a cause of action to compel arbitration accrues when a party unequivocally refuses a demand to arbitrate. See Westinghouse, 736 F.2d at 902. The union argues that Associated's claim accrued on or about March 1, 1985, when Harrington notified Zotollo of the union's refusal to submit the grievances to arbitration. Noting that the Agreement requires that the demand for arbitration be in writing, Associated argues that its cause of action did not accrue until May 1986, when the union rejected Associated's written demand to arbitrate. Associated also disputes the union's contention that it made an earlier oral refusal to arbitrate. In this case, the district court found that Associated's cause of action accrued when the union rejected the written demand for arbitration in May 1986. We agree. The petition to compel arbitration, brought in June 1986, is timely.
 
 IV. Other Claims
 
 26
 The union's remaining claims must be referred to the arbitrator for decision. The union raises the defense of laches, claiming that it is prejudiced by Associated's delay in demanding arbitration. As already indicated, this issue is for the arbitrator. Conticommodity Services Inc., 613 F.2d at 1226-27. The union also claims that this action is moot because the Agreement expires on May 31, 1987, and none of Associated's grievances are susceptible to retroactive relief. These claims do not affect the court's limited inquiry on a petition to compel arbitration. See Prudential Lines, Inc., 704 F.2d at 66.
 
 
 27
 The order compelling arbitration is affirmed.
 
 
 
 [1]
 Section 1 of Article VIII provides:
 Section 1. Except as herein otherwise provided in Article V of this Agreement, all complaints, disputes or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties or their respective members, directly or indirectly, claiming to be aggrieved, shall be submitted in writing by the party hereto and the Arbitration Board of the respective Association and the Arbitration Board of the Bricklayers' Unions mentioned herein (who shall together constitute and be designated as the Joint Arbitration Board) shall in the first instance investigate such complaints, grievances or disputes, and attempt adjustment. The Joint Arbitration Board shall consist of three (3) representatives designated by the District Council and three (3) representatives designated by the Association. Decisions determining such complaints, disputes and grievances shall be arrived at within ten (10) days after submission in writing in the manner above referred to of such complaint, dispute or grievance, unless time is extended in writing by the chairmen of both Arbitration Boards constituting the Joint Board.
 Decisions jointly reached by the Joint Arbitration Board shall be binding on the parties hereto.
 Should the Joint Arbitration Board fail to agree, the question or dispute shall be referred to an umpire selected by the Joint Arbitration Board, if a request in writing is filed within forty-eight (48) hours thereafter by either party to this Agreement. Should the parties constituting the Joint Arbitration Board fail to agree upon the selection of an umpire within five (5) days after such request is made, then, upon the application of either party, the President of Fordham University or his successor shall summarily appoint such umpire. Each side shall present its case before the umpire who shall within two (2) days thereafter render his decision. The decision rendered shall be final and binding upon both parties hereto. The decision of the umpire with respect to an interpretation of any provision of this Agreement shall be binding upon the parties to this Agreement. Each case shall be considered on its merits and the within Collective Agreement shall constitute the basis upon which decisions shall be rendered.
 All decisions reached by the Arbitration Boards of the parties hereto, or rendered by the umpire, shall be complied with within forty-eight (48) hours. Should any member of the Association fail to comply with such decision within such time he shall automatically lose all rights and privileges under this Agreement and the Unions shall be free to take action to enforce the rights of the Unions or any of its members against such member of the Association.
 All disputes shall be heard on notice sent by registered mail to all parties interested therein. The compensation of the umpire shall be upon a perdiem basis for the time consumed in hearing and determining disputes as herein provided and in an amount agreed upon between the parties to this Agreement and the umpire. The amount so agreed upon and any incidental expenses incurred by the umpire shall be borne equally between the parties to this Agreement.
 The Arbitration Board and umpire shall have all the powers accorded to an arbitrator under the arbitration laws of the State of New York and the rules of the American Arbitration Association, the Arbitration Board to subpoena witnesses, or books, records, documents, etc., as hereinafter more fully provided.
 The members of the Association will be required to keep records from the date of this Agreement and for the entire duration thereof, of all payrolls, cancelled checks, and other books and records where material and relevant to such dispute, complaint or grievance, when requested by the Joint Arbitration Board or umpire. A set of rules and regulations for the conduct and procedure of the Joint Arbitration Board shall be adopted within thirty (30) days of the consummation of this Agreement.
 
 
 [2]
 Section 2 of Article VIII provides:
 Section 2. The third Friday in February shall be the date set for a special meeting for the consideration of the Trade Agreement by the Joint Arbitration Boards. Should either side desire any change in this Agreement other than as provided before, such change must be submitted in writing before the special meeting on the third Friday in February, 1984. If the terms of renewal are not agreed upon by March 31, 1984 all terms in dispute concerning which a deadlock may exist are to be referred to an arbitration tribunal for determination, such tribunal to be selected in the manner described below:
 On or before April 5, 1984 should a deadlock exist on March 31, 1984, each side shall select one (1) man as its representative on said tribunal and such representatives so selected shall be authorized and directed to select a third man as umpire or referee. Should the representatives so directed fail to agree upon the selection of an umpire within five (5) days, and upon the application of either party, the President of Fordham University, or his successor, shall summarily appoint such umpire. Should arbitration with respect to the deadlock existing on March 31, 1984 be continued beyond May 31, 1984 the findings shall be retroactive to June 1, 1984.
 As indicated in the text, the contract was renewed except as modified in certain respects. Whether the dates in Section 2 were to be changed is not a question we have to reach in this decision.