786 F.2d 93
 121 L.R.R.M. (BNA) 3240, 104 Lab.Cas. P 11,914
 EMERY AIR FREIGHT CORPORATION, Plaintiff-Appellee,
v.
LOCAL UNION 295, affiliated with the International
Brotherhood of Teamsters, Chauffeurs, Warehousemen and
Helpers of America; Frank Calise; Local Union 851,
affiliated with the International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America; and Mark
Davidoff, Defendants-Appellants,
and
Stanley Aiges, Defendant.
 No. 803, Docket 85-7923.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 5, 1986.
Decided March 19, 1986.
 
 Stephen H. Kahn, New York City, for defendants-appellants.
 Betty Southard Murphy, Washington, D.C. (Baker & Hostetler, David A. Grant, Vincent D. McDonnell, New York City, Rogers & Wells, of counsel), for plaintiff-appellee.
 Before FEINBERG, Chief Judge, VAN GRAAFEILAND and CARDAMONE, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 Defendants Local Unions 295 and 851, both affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Frank Calise and Mark Davidoff (collectively referred to hereafter as the Unions) appeal from an order of the United States District Court for the Southern District of New York, Kevin T. Duffy, J., granting the application of plaintiff-appellee Emery Air Freight Corporation (Emery) to enjoin an arbitration sought by the Unions and denying the Unions' application for an order compelling Emery to arbitrate certain disputes with them. The principal issue raised by the appeal is whether the expiration of the collective bargaining agreements between the parties justified the order of the district court. For reasons set forth below, we reverse that order and remand with instructions.
 
 I.
 
 2
 In late October 1985, Emery brought this action under Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, seeking injunctive relief against arbitrations demanded by the Unions earlier that month. The background of the dispute leading up to those demands is as follows. Emery is engaged in the business of express delivery. For more than 10 years, Locals 295 and 851 have been the exclusive bargaining representatives of Emery's drivers, dockmen, messengers and clericals in the New York metropolitan area. Calise and Davidoff are officers of Local 295 and Local 851, respectively. The Locals are parties to separate three-year collective bargaining agreements (the Agreements) with Emery, which commenced on September 1, 1982.
 
 
 3
 The provisions of the Agreements relevant to this appeal are identical. Each contains a broad Arbitration Clause, which provides in pertinent part:
 
 
 4
 Should any dispute or grievance arise between the Employer and the Union, as to the meaning, import and application of, or compliance with the provisions of this Agreement, or should any grievance or dispute arise as between the Employer and the Union, such dispute or grievance shall be settled
 
 
 5
 ....
 
 
 6
 through a multi-step grievance and arbitration procedure culminating in "final and binding" arbitration by the Impartial Chairman named in the Agreements, Stanley Aiges, who is a nominal defendant in this action.
 
 
 7
 The Agreements also contain a Maintenance of Standards provision, which states:
 
 
 8
 The employer agrees that all conditions of employment in his individual operation relating to wages, hours of work, overtime differentials and general work conditions shall be maintained at no less than the highest standards in effect. The Employer further agrees that it will in no way seek to enforce or impose any subsequent agreement or Master Agreement affecting the air freight industry which will reduce any of the standards established by this Agreement.
 
 
 9
 There are also various provisions in the Agreements that protect the job security of union members in various ways; e.g., by recognition of the Unions as the exclusive bargaining representatives, by barring subcontracting, by requiring union membership after 30 days of employment and by describing which Emery operations are governed by the Agreements.
 
 
 10
 In anticipation of the expiration of the Agreements on August 31, 1985, negotiations for their renewal began in mid-July 1985. Claiming that competitive conditions justified its position, Emery sought a number of substantial contractual changes including layoff of approximately 75 bargaining unit employees, introduction of part-time employees and a two-tier wage structure and reduction of various economic benefits, including holidays and sick leave. The Unions characterized these concessions as "give-backs." A number of bargaining sessions were held before August 31, 1985, but the parties were unable to reach agreement. The bargaining was acrimonious, with the Unions threatening to strike if Emery insisted on all the give-backs. Emery indicated that it intended to operate during a strike, and, as the district court found, "during the month of August 1985" began "training employees of an outside contractor to handle Emery's business should a strike later occur."
 
 
 11
 After August 31, 1985, the parties continued to bargain but remained far apart on certain key issues. Emery continued to operate and there was as yet no strike. The Unions claim that at a negotiating session on September 22, they raised a grievance regarding the use of "secret workers" but that Emery refused requests to reveal the names of the workers involved or where they worked. In this court, Emery disputes the Unions' characterization of these events, which Emery describes as an agreement with a stand-by independent contractor, Leaseway, to provide temporary drivers in the event of a strike, which the Unions were continually threatening.
 
 
 12
 On October 2, 1985, after an unproductive bargaining session, the Unions sent Emery identical written grievances, which stated as follows:
 
 
 13
 The Union hereby grieves Emery's violation of the last sentence of the "Maintenance of Standards" provision contained in the 1982-1985 Collective Bargaining Agreement. Emery's Bargaining proposals which insist upon the reduction of standards and Emery's attempt to enforce or impose a subsequent Collective Bargaining Agreement which reduces standards plainly violates the maintenance of standards provision. Remedy this violation immediately or the Union will pursue it through the grievance-arbitration procedure.
 
 
 14
 On October 3, 1985, Emery delivered to the Unions its final offer in writing, which confirmed that the Agreements were terminated and indicated that Emery would consider the parties deadlocked if no favorable response was received by a stated deadline. On October 7, Emery delivered to the Unions notices reflecting the terms of the final offer and stated that they would be posted at work sites on October 10 and would govern all terms and conditions of employment beginning on that date. The notices made clear that, among other things, 75 jobs would be eliminated, 25 full-time employees would be converted to part-time status, and a number of fringe benefits would be reduced or eliminated. On October 7, Emery also replied to the Unions' October 2 written grievances, contending, among other things, that the facts underlying the grievances arose after the expiration of the Agreements and therefore Emery had no obligation to respond, and that in any event the grievances did not even raise a colorable question of interpretation under the expired contracts. On that same day, both Emery and the Unions filed charges with the NLRB. Each side alleged the other's position constituted an unfair labor practice.
 
 
 15
 On October 8, the parties met again but remained far apart in the negotiations. At that time, the Unions served written demands for arbitration on Emery as follows:
 
 
 16
 The disputes arise under the 1982-1985 collective bargaining agreement which is in effect between Emery and the Union. The disputes are:
 
 
 17
 (a) Hiring non-union employees to perform bargaining unit work, concealing the identity of these employees from the Union and simultaneously insisting upon the layoff of the bargaining unit employees, in violation of the contractual sections pertaining to union security, recognition, subcontracting, maintenance of standards, covered operations and hiring hall.
 
 
 18
 (b) Seeking to enforce or impose a subsequent agreement or Master Agreement affecting the air freight industry which will reduce the standards established by the 1982-1985 agreement, in violation of the Maintenance of Standards provision.
 
 
 19
 For convenience, we shall refer to the first grievance listed above as the secret workers grievance and to the second as the reduced standards grievance. The Unions sent copies of their demand to the impartial arbitrator designated in the Agreements, and he subsequently informed Emery that he intended to proceed with the requested arbitration on November 6, 1985.
 
 
 20
 On October 10, 1985, Emery posted at its metropolitan area worksites the list of changes in conditions of employment that were contained in its October 7 notices. The Emery employees represented by the Unions went on strike that same day. On October 28, Emery brought this action in the district court to enjoin the scheduled arbitration.[1] Judge Duffy heard oral argument on the applications of Emery to enjoin the arbitration and of the Unions to compel it, but held no evidentiary hearing because the parties, in response to his questions, did not identify any issues of disputed material facts. Thereafter, the judge issued a memorandum opinion in which he first addressed the merits of the Unions' reduced standards grievance, stating that it was based on a "strained interpretation" of the parties' intent, unsupported by bargaining history. Then the judge stated that once the Agreements had expired, "there was no contract and therefore no agreement to arbitrate." The judge then discussed the merits of the secret workers grievance. Although he found that Emery had been "training employees of an outside contractor" before the contract expired, he also barred arbitration of this grievance because the Unions had suffered no harm since no Union members were replaced until the contract had expired. Citing Boys Market, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the judge also ruled that an arbitration order would be "wholly inappropriate" because the Unions went on strike even though the collective bargaining agreement had a "no-strike" provision. He held that injunctive relief for Emery was proper because it would be irreparably harmed if required to arbitrate when it had not contracted to do so, particularly since the same issues were pending before the National Labor Relations Board (NLRB). This appeal followed.
 
 II.
 
 21
 In this court, the Unions argue that the district court improperly determined the merits of their grievances rather than whether they were arbitrable. It is certainly true that the district court should play only a limited role when a party to a labor agreement seeks to enjoin or compel arbitration. The law has long been clear that where the parties have contracted to resolve their disputes by arbitration, a court asked to enforce that agreement should not weigh the merits of a claim that the agreement has been violated. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). The point has been driven home many times by the Supreme Court and by this court. Even if it appears to the court that the claim is frivolous, a union's assertion that an employer has violated the labor agreement should be decided by the arbitrator not by the court, because "[t]he agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." Id. at 568 & n. 6, 80 S.Ct. at 1346 & n. 6. The reasons are simple and straightforward. The parties have agreed that an arbitrator should determine the merits of such claims and it is national policy to encourage resolution of disputes between management and labor by such peaceful means. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960). In this by now traditional analysis, a court should first examine the scope of the arbitration clause to see if it is the broad one generally in use governing "all disputes" as to the meaning, application or compliance with the collective bargaining agreement, or is a narrower version which may exclude particular subjects from arbitration. See Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80, 605 F.2d 1290, 1295 (2d Cir.1979). The court must then determine whether the Union has made a claim that "on its face is governed by the contract." American Manufacturing, supra, 363 U.S. at 568, 80 S.Ct. at 1346. If it has and if the arbitration clause is broad, then the court should order arbitration.
 
 
 22
 There are further aspects of this analysis, of course, two of which are discussed below, but before reviewing the issues before us we should make clear that in this case the district court did not confine itself to this traditional analysis, but rather ventured into the merits of the Unions' two grievances. Thus, the district court assumed that the duty to arbitrate expired automatically with the contract, and apparently never considered the scope of the Arbitration Clause and whether the grievances fell within it. Instead, the district court seemed to focus on whether Emery's "actions could be considered violations of the expired Agreement." The judge characterized the Unions' interpretation of the Maintenance of Standards provision as "strained" and noted that it was inconsistent with prior bargaining history. Similarly, the court stated with respect to the secret workers grievance that the Unions suffered no injury and that "[m]erely training replacement people where a strike is imminent is ... permissible." These observations would have been appropriate for a tribunal deciding the merits of the disputes between the parties, not whether they were arbitrable.
 
 
 23
 Emery's principal claim on appeal is that the Arbitration Clause was not in effect when the Unions demanded arbitration on October 8, 1985, because the Agreements that included the clause had expired on August 31. This contention raises one of the critical issues in the traditional analysis referred to above, since it is undisputed that arbitration is a creature of contract, and a court must determine whether there is an arbitration agreement for it to enforce. Warrior & Gulf, supra, 363 U.S. at 582, 80 S.Ct. at 1352. In this case, there is no doubt that between September 1, 1982 and August 31, 1985 there was an agreement to arbitrate. The question before the district court was whether the obligation to arbitrate continued even though, according to Emery, the Agreements terminated on August 31. That such an obligation to arbitrate can survive contract expiration was made clear by the Supreme Court in Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). In that case, a collective bargaining agreement had terminated four days before the employer closed a plant, which in turn caused a dispute over severance pay. Nevertheless, the Court held that the employer was required to arbitrate a claim for such pay. In the course of its decision, the Court pointed out that the Union's claim for benefits and the employer's refusal to pay them were based on different interpretations of the expired agreement, id. at 248-49, and that the grievance had been raised within a reasonable time after the contract's expiration. Id. at 255, n. 8. The Court recognized that the duty to arbitrate is a creature of contract, but stated that "in the absence of some contrary indication, there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract," id. at 253, 97 S.Ct. at 1073. See also John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).
 
 
 24
 The doctrine of Nolde continues to be followed both in this circuit, see, e.g., International Union of Elevator Constructors v. National Elevator Industry, Inc., 772 F.2d 10 (2d Cir.1985); Glover Bottled Gas Corp. v. Local Union No. 282, 711 F.2d 479, 481-82 (2d Cir.1983); Ottley v. Sheepshead Nursing Home, 688 F.2d 883, 886 (2d Cir.1982); McAllister Bros. v. A & S Transportation Co., 621 F.2d 519, 522 (2d Cir.1980), and in other circuits as well. See, e.g., International Brotherhood of Electrical Workers, Local 1228 v. Freedom WLNE-TV, 760 F.2d 8 (1st Cir.1985); Local Joint Executive Board of Las Vegas, Culinary Workers Local 226 v. Royal Center, Inc., 754 F.2d 835 (9th Cir.1985), cert. granted, --- U.S. ---, 106 S.Ct. 1627, --- L.Ed.2d --- (1986); Federated Metals Corp. v. United Steelworkers of America, 648 F.2d 856 (3d Cir.), cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).
 
 
 25
 Applying the analysis called for by the Steelworkers Trilogy, as amplified by Wiley and Nolde, the Arbitration Clause in the Agreements is a broad one. It applies not only to "any dispute" concerning "the meaning, import and application of, or compliance with the provisions of" the Agreements, but also to "any grievance or dispute" that should "arise as between the Employer and Union." Moreover, there is nothing in the Arbitration Clause that would justify our saying "with positive assurance that [it] is not susceptible of an interpretation that covers the asserted dispute." Warrior & Gulf, supra, 363 U.S. at 582-83, 80 S.Ct. at 1353. We have often reiterated that exclusion of a grievance from a broad clause like this one requires "compelling proof" of the parties' intent to do so, in language that is "unmistakably clear." International Union of Elevator Constructors, supra, 772 F.2d at 13. Under the circumstances, we simply do not see why the Nolde presumption of arbitrability does not apply here. The secret workers grievance is based upon Emery's conduct before September 1, 1985, while the Agreements were concededly still in effect. Although the grievance was not raised, according to the Unions, until September 22, this was soon after the Unions first learned of Emery's plans and was within "a reasonable time" after August 31, assuming that the Agreements terminated then. The reduced standards grievance was apparently first raised on October 2, but this too satisfied the Nolde reasonable time requirement. The Agreements, even on Emery's theory of the case, had expired only four and one-half weeks before. Moreover, the Unions raised the grievance as soon as it became apparent that Emery planned to impose reduced standards. In addition, the parties were still negotiating and no change in working conditions had as yet been put in effect.[2]
 
 
 26
 There is, of course, another component of the traditional analysis referred to above. The grievance must arise under the collective bargaining agreement, that is, the party raising it must at least point to a provision in the contract that covers the dispute in question. But this requirement is not difficult to meet. In American Manufacturing, supra, the Supreme Court ordered arbitration of a clause characterized as "frivolous" and "patently baseless" by the appellate court below. The Court stated unequivocally that even if a claim appears "frivolous" on the merits, a court should require arbitration. 363 U.S. at 568 & n. 6, 80 S.Ct. at 1346 & n. 6. As long as the demands are not "so plainly unreasonable that ... it can be seen in advance that no award to the Union could receive judicial sanction," Wiley, supra, 376 U.S. at 555, 84 S.Ct. at 917, the court must defer the merits of the matter to the arbitrator. Similarly, we have characterized this requirement as calling for only a "barely colorable" claim, Andros Compania Maritima S.A. v. Marc Rich & Co. A.G., 579 F.2d 691, 704 (2d Cir.1978). Obviously, some claims may be so outlandish or devoid of reference to the collective bargaining agreement that even this low threshhold will not be satisfied.[3] But we cannot say that this is the case here.
 
 
 27
 With regard to the secret workers grievance, the Unions' position is that Emery's training of replacement employees in bargaining unit positions while simultaneously demanding layoff of unionized members of the bargaining units violated sections of the Agreements pertaining to union security, recognition, subcontracting, maintenance of standards, covered operations and hiring hall. This dispute clearly arises under the Agreements and unquestionably would have been arbitrable had it been asserted before the contracts expired. The timing of the filing of the grievance, on these facts, does not bar arbitration. Nolde, 430 U.S. at 250-54, 97 S.Ct. at 1071-73. With regard to the reduced standards grievance, the Unions' position is that the second sentence of the Maintenance of Standards provision bars Emery from seeking unilaterally to enforce or impose any terms of employment below those established by the 1982-1985 Agreements. In other words, the 1982-1985 Agreements are the floor below which Emery may not go in the next agreement without the Unions' consent. Emery argues that the Maintenance of Standards clause means something entirely different--that the employer is barred from imposing an industry-wide master agreement, with lower standards, during the life of the contract. Emery states that the Unions never previously advanced their current view of the clause, and, on the contrary, often agreed to reduced standards. The Unions' reply is that the clause does not bar joint agreement to reductions, but only Emery's unilateral imposition of them. Emery also argues that the Unions' claim is a thinly disguised effort to achieve through arbitration what they failed to obtain at the bargaining table--new contracts without concessions. As stated above, however, a determination of the meaning of the clause is for the arbitrator.
 
 
 28
 In sum, we agree with appellants that the arbitrator, not the district court, should determine the merits of the two grievances. While the Unions may have a weak case on the merits on either or both, under the traditional analysis we cannot say that they are not entitled to argue them before the arbitrator.
 
 III.
 
 29
 Appellants also take issue with the district court's other grounds for granting injunctive relief to Emery. In addition to concluding that the grievances were not arbitrable on the merits, the district judge stated that the Unions had forfeited their right to arbitration because, under the teaching of Boys Market, supra, 398 U.S. 235, 90 S.Ct. 1583, arbitration is a quid pro quo for honoring a no-strike clause. However, even if the Unions were striking over an arbitrable issue, which we do not suggest is the case, that would not constitute a waiver of their right to arbitrate the dispute. Ice Cream Drivers & Employees Union Local 757 v. Borden, Inc., 433 F.2d 41, 45 (2d Cir.1970), cert. denied, 401 U.S. 940, 91 S.Ct. 938, 28 L.Ed.2d 220 (1971). With regard to the strike, a district judge may have other remedies available in such circumstances, but Boys Market was designed to promote arbitral settlement of labor disputes, not to curtail it. Boys Market, supra, 398 U.S. at 249, 90 S.Ct. at 1591.
 
 
 30
 The district court also enjoined arbitration on the ground that Emery would suffer irreparable harm if forced to arbitrate. But, as the preferred method for resolving labor disputes, arbitration by itself imposes no such injury to the resisting party, except perhaps in "extraordinarily rare" circumstances, which we need not try here to imagine. See Graphic Communications Union v. Chicago Tribune Co., 779 F.2d 13, 16 (7th Cir.1985) (refusing to stay arbitration of post-contract grievance). The monetary cost of arbitration certainly does not impose such legally recognized irreparable harm. Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974); Graphic Communications, supra, 779 F.2d at 15. Nor is the pendency of the same issues before the NLRB a basis for staying arbitration. Local 807, International Brotherhood of Teamsters v. Brinks, Inc., 744 F.2d 283, 286 (2d Cir.1984). The NLRB and arbitrators have concurrent, overlapping jurisdiction over many labor disputes and the NLRB may either defer to the arbitrator's award or, if the latter is inconsistent with established law, disregard it. Carey v. Westinghouse Electric Corp., 375 U.S. 261, 270-72, 84 S.Ct. 401, 408-09, 11 L.Ed.2d 320 (1964). Indeed, we are informed that the Acting Regional Director of the NLRB has issued rulings that deferred decisions on charges filed by both sides concerning the reduced standards issue until its arbitrability had been fully resolved, and, if arbitration is ordered, until its completion. The Acting Regional Director also refused to issue a complaint on the Unions' charge that Emery's activities in preparation for the strike constituted an unfair labor practice. While this ruling involves many of the facts at issue in the secret workers grievance, it does not divest the court of jurisdiction to order arbitration, Smith v. Evening News Ass'n, 371 U.S. 195, 197, 83 S.Ct. 267, 268, 9 L.Ed.2d 246 (1962). The NLRB's decision concerns only the legality of Emery's behavior, not whether it violated the collective bargaining agreements. International Union of Electrical, Radio and Machine Workers v. General Electric Co., 407 F.2d 253, 264 (2d Cir.1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969). Accord, Edna H. Pagel, Inc. v. Teamsters Local Union 595, 667 F.2d 1275, 1279-80 (9th Cir.1982). Moreover, the proceeding before the NLRB "was administrative only, neither formally adversarial nor like a trial. As such, it has no collateral estoppel effect." General Electric, supra, 407 F.2d at 264.
 
 
 31
 Emery insists that it will be irreparably harmed if forced to arbitrate these grievances because an arbitral victory for the Unions would force Emery to adhere to the standards of an expired contract, and would irreconcilably damage its ability to engage in collective bargaining negotiations and to conduct its business. Such a decision, according to Emery, will be virtually unreviewable even if it violates labor law, because of the strong policy in this circuit of deference to arbitration awards. But this argument points up the improbability that Emery would have agreed to the Unions' interpretation of the Maintenance of Standards provision. In other words, the argument really goes to the merits of the grievances, not to their arbitrability. Moreover, there are numerous reported cases in which an employer was required to arbitrate, during the pendency of a strike, the legitimacy of its post-contract conduct. See, e.g., Rochdale Village, supra. Emery's interpretation of the Maintenance of Standards Clause, and the intent of the parties when they negotiated it, must be argued to the arbitrator designated in the contract, who surely knows the parties, their past bargaining positions and the "law of the shop" here better than we do. Warrior & Gulf, supra, 363 U.S. at 582, 80 S.Ct. at 1352. Furthermore, although arbitral awards are not easily upset in this circuit, Andros Compania Maritima, supra, 579 F.2d at 704, should the arbitrator issue one that is irrational or clearly contrary to federal law, we trust it will not stand up under judicial scrutiny.
 
 
 32
 Emery also asserts that diminished customer confidence in its operations will result from the mere possibility that the Unions will prevail at arbitration, and that this constitutes irreparable harm. But even if that were a ground to stay arbitration, which it is not, we fail to see how arbitration would pose a greater risk to Emery's business stability than the acrimonious labor dispute and strike now prevailing.
 
 
 33
 The judgment of the district court is reversed and the case is remanded with instructions to vacate the preliminary injunction and order arbitration of both grievances.
 
 
 
 [1]
 A few days earlier, on the application of Emery and Leaseway, the Regional Director of the NLRB obtained a temporary injunction under section 10(j) of the National Labor Relations Act, 29 U.S.C. Sec. 160(j), which, among other things, enjoined the Unions from restraining, coercing or threatening employees of the two companies or those doing business with them
 
 
 [2]
 It is even arguable, on another view of the facts, that both grievances were raised before the termination of the Agreements. The argument is that while the Agreements were due to expire on August 31, 1985, Emery apparently continued them in effect until October 10, when it imposed the changes contained in its final offer. In some of its documents, Emery impliedly distinguished between the "expiration" of the contracts and their later "termination." For example, the October 3 final offer states: "This letter also specifically confirms that each of the three agreements ... is terminated." The list of conditions of employment posted by Emery on October 10, also refers to the contract "which expired August 31, 1985 and has been terminated." (emphasis supplied). Further, Emery's October 9 response to the Unions' demands for arbitration says: "to the extent there is any issue or argument whether the Maintenance of Standards provisions would prohibit posting and implementation of any or all terms and conditions, our posting will specifically terminate any such application."
 
 
 [3]
 For example, a union might assert a claim which is "totally devoid of possible merit on the facts," or which evidences patent bad faith and is "clearly unconscionable," International Union of Electrical, Radio and Machine Workers v. General Electric Co., 407 F.2d 253, 259 n. 12 (2d Cir.1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969). See Diamond Glass Corp. v. Glass Warehouse Workers and Paint Handlers Local Union, 682 F.2d 301, 303-04 (2d Cir.1982), relied on by Emery, in which the union's arbitration claims did not refer to any article or section of the expired agreement or to any right arising under it; see also Local 807, International Brotherhood of Teamsters v. Brinks, Inc., 744 F.2d 283, 286 (2d Cir.1984), in which the court noted that "nothing in the agreements can be construed to cover" the claims made by the union