944 F.2d 1037
 138 L.R.R.M. (BNA) 2486, 60 USLW 2299,
120 Lab.Cas. P 10,947
 TRUCK DRIVERS LOCAL UNION NO. 807, I.B.T., Plaintiff-Appellant,
v.
REGIONAL IMPORT & EXPORT TRUCKING CO., INC.; Regional
Distribution & Warehousing Service, Inc., Newport
Transportation Co., Inc.; Defendants-Appellees.
 No. 1706, Docket 91-7067.
 United States Court of Appeals,
Second Circuit.
 Argued June 19, 1991.
Decided Sept. 24, 1991.
 
 J. Warren Mangan (O'Connor & Mangan, Long Island City, N.Y., of counsel) for plaintiff-appellant.
 Michael T. McGrath (Putney, Twombly, Hall & Hirson, New York City, of counsel) for defendants-appellees.
 Before MESKILL, KEARSE and McLAUGHLIN, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 
 1
 Truck Drivers Local Union No. 807 ("Local 807" or "Union") seeks to arbitrate certain alleged breaches of contract by three related corporations: Regional Import & Export Trucking, Regional Distribution & Warehousing Service (collectively "Regional"), and Regional's alleged alter ego, Newport Transportation Co. ("Newport"). Were this our only concern, the inquiry would be rather simple. Our task is complicated, however, because the National Labor Relations Board ("NLRB" or "Board") has recently issued a ruling in this case, based on the same nucleus of facts, holding that the actions of Regional, Newport, and Local 807 constituted unfair labor practices in violation of Section 8 of the National Labor Relations Act ("Act"). 29 U.S.C. § 158. With the statutory issues decided by the NLRB closely intertwined with the contractual issues in the present controversy, we proceed gingerly.
 
 
 2
 Local 807 brought this action in the United States District Court for the Eastern District of New York under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to compel Regional and Newport to arbitrate certain contractual grievances arising under the collective bargaining agreement between Local 807 and Regional ("Regional Agreement"). Local 807 promptly moved for summary judgment, which Regional opposed on the ground that the Board's decision precluded arbitration. Co-defendant Newport cross-moved for summary judgment on the ground that, because it was not a party to the Regional Agreement, it could not be bound by the arbitration clause of the Regional Agreement. In opposing Newport's cross-motion, Local 807 took the position that material issues of fact existed as to whether Newport could be bound by the Regional Agreement.
 
 
 3
 While these motions were pending, a related charge of unfair labor practices on the part of Regional and Newport and a charge against the Union for breach of its duty of fair representation were proceeding apace before the NLRB. The Board sustained the charges against Regional, Newport, and the Union, and also refused to defer the unfair representation claim pending arbitration because it found an intrinsic conflict of interest on the part of the Union. The Board's ruling was eventually enforced by the Third Circuit Court of Appeals. Because the NLRB held that deferral to arbitration was inappropriate, the district court in the present proceeding determined that the Union was collaterally estopped from demanding arbitration. The district court, accordingly, denied Local 807's motion for summary judgment and granted Newport's cross-motion for summary judgment. This appeal ensued.
 
 BACKGROUND
 
 4
 Regional is in the trucking industry. This includes pick-up and transportation of freight from piers in the New York metropolitan region, as well as warehousing and distribution. Regional Import & Export opened for business in 1965, performing the pick-up and transportation services; Regional Distribution & Warehousing, a separately incorporated entity, began providing warehousing and distribution services to customers in 1974. All of these operations were consolidated in 1978, although the corporations maintained their distinct corporate identities.
 
 
 5
 Local 807 is the exclusive bargaining representative of Regional's truck drivers, platform men, checkers, warehousemen, and hi-lo operators. After the 1978 consolidation of operations, employees from Regional Distribution & Warehousing became disgruntled by what they viewed as inequities between their own pay rates and those of the employees of Regional Import & Export. In 1985, as the Local 807/Regional Import & Export collective bargaining agreement was due to expire, the Union began negotiating a single renewal contract to cover all of Regional's bargaining-unit employees and, in the process, to eliminate the alleged pay inequities. Negotiations were heated, with Regional steadfastly opposing any significant wage increases. Eventually, Regional grudgingly agreed to an across-the-board wage increase of fifty cents per hour and to several additional provisions designed to resolve the disparity between the terms and conditions of employment of the two groups of Regional employees.
 
 
 6
 Regional and Local 807 memorialized this contract in a memorandum, which contained eight substantive provisions, and specifically incorporated all the terms and conditions of employment contained in the 1982 collective bargaining agreement between Local 807 and Regional Import & Export. One of the incorporated terms was the arbitration clause, providing for arbitration of "any controversy which might arise" between the parties.
 
 
 7
 Shortly thereafter, Andrew Ferrara entered the picture. Ferrara was Regional's overseer of operations, and he asked Patrick Nastro, Regional's president, to turn over several Regional accounts to him, which he would then personally manage through an independent business entity. Nastro eventually agreed. Ferrara then proceeded to incorporate a new company--defendant Newport--which, like Regional, would provide various services in the trucking industry.
 
 
 8
 Pursuant to the understanding between Nastro and Ferrara, Newport entered into several agreements with Regional which provided for the lease and/or transfer of certain Regional vehicles and equipment to Newport. Regional also transferred a number of its accounts to Newport. Additionally, a significant portion of Regional's managerial staff moved over to Newport's payroll. In turn, Regional began to trim its staff, necessitating the layoff of approximately twenty-seven employees. Thus, while Regional remained a going concern, its operations, management, and equipment were significantly streamlined by the agreements with Newport.
 
 
 9
 Once Newport commenced operations, Local 807 demanded to be recognized as the exclusive bargaining representative of Newport's employees. Newport eventually granted recognition to Local 807, and the two entered into a collective bargaining agreement (the "Newport Agreement").
 
 
 10
 Fernando Sanches, who used to work for Regional, filed an unfair labor practice charge with the NLRB, alleging that he had been laid off because of the unlawful creation of Newport by Regional. He charged that Newport was a sham, that it was actually the alter ego of Regional and had been created solely to avoid Regional's obligations under the 1985 collective bargaining agreement. Sanches also filed a grievance with his union, Local 807, alleging that the sham transaction was a breach of the Regional Agreement. Local 807, which it will be recalled now represented the employees of both Regional and Newport, failed to accept and process Sanches' grievance, so Sanches filed another unfair labor practice charge against Local 807 for breach of its duty of fair representation. The NLRB thereafter issued an amended consolidated complaint, charging the corporations (Regional and Newport) with violating Section 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) & (3), and charging the Union (Local 807) with violating Section 8(b)(1)(A) of the Act.
 
 
 11
 Reacting to the NLRB complaint, Local 807 filed a demand for arbitration of Sanches' grievance against Regional; and Regional and Local 807 initially agreed to arbitrate, provided the grievance was "otherwise arbitrable." Regional and Local 807, in their respective answers to the NLRB unfair labor practice charges, then interposed the affirmative defense that all issues were subject to binding arbitration, and, therefore, the NLRB should defer to arbitration. As the NLRB proceeding progressed, however, Regional withdrew this affirmative defense because it believed that Local 807, representing, as it did, the employees of both Regional and Newport, had an inherent conflict of interest that made deferral to arbitration improper. The Union, however, continued to maintain that there was no conflict and that the NLRB proceedings should be deferred pending the outcome of arbitration.
 
 
 12
 Because Regional now refused to go to arbitration, Local 807 commenced the present action in the Eastern District of New York, seeking to compel Regional and Newport to arbitrate pursuant to the Regional Agreement. Local 807 then moved for summary judgment against Regional to compel arbitration.[1] In opposing this motion, Regional argued that the ALJ assigned to the NLRB proceeding would be deciding whether deferral to arbitration was proper. Newport also cross-moved for summary judgment on the ground that, because it was neither a party to the Regional Agreement nor a successor or alter ego of Regional, it could not be bound by the provisions of the Regional Agreement.
 
 
 13
 Before the district court could rule on these motions, the ALJ issued a voluminous decision on the unfair labor practice charges. The ALJ determined that all three respondents (Regional, Newport, and Local 807) had committed unfair labor practices. Specifically, he held that Regional had violated Section 8(a)(3) of the Act by creating Newport and thereafter laying off bargaining-unit employees; that Newport was the alter ego of Regional, and had also violated the Act; and that Local 807 had violated Section 8(b)(1)(A) of the Act by refusing to accept and process the grievance filed by Sanches, a bargaining-unit employee of Regional. The ALJ concluded that Regional, Newport, and Local 807 were jointly liable for remedying these unfair labor practices.
 
 
 14
 Squarely addressing the deferral issue, the ALJ stated that deferral to arbitration was inappropriate for several reasons, including the fact that Local 807 faced a conflict "in representing the Newport employees at the same time it [sought] to replace them with the Regional unit workers." ALJ's Decision at 49. The ALJ continued that "[a] further aspect of this conflict is [Local 807's] alignment with ... Newport against [the interests] of the Regional work force arising from its active role in seeking a contract with Newport at a time when it owed an exclusive duty to the Regional unit members in preserving their jobs...." Id.
 
 
 15
 All three respondents appealed to the NLRB, which affirmed the ALJ in all respects relevant to this appeal. Regional and Newport then announced that they would comply with the Board's ruling. Local 807, however, petitioned the Third Circuit to reverse the Board. The Third Circuit enforced the Board's order in an unpublished decision.
 
 
 16
 The district court now had to consider the pending motions for summary judgment in a radically changed landscape, i.e., the Board's enforced order. Judge Spatt held that he had jurisdiction to entertain these claimed contractual breaches, notwithstanding the Board's decision on the statutory issues. He then determined that Local 807 was collaterally estopped from compelling arbitration because of the Board's finding that deferral to arbitration was inappropriate. Judge Spatt therefore denied Local 807's motion. Turning to Newport's cross-motion, Judge Spatt concluded that issues of fact existed as to whether Newport was the alter ego of Regional. However, in light of his decision that he was barred from compelling arbitration because of the now-affirmed NLRB ruling, he granted Newport's cross-motion for summary judgment dismissing the Union's motion to compel arbitration.
 
 
 17
 This appeal followed.
 
 DISCUSSION
 
 18
 The precepts governing our review of a motion to compel arbitration are now firmly established. In AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), the Supreme Court distilled the relevant considerations and enunciated four intersecting principles to guide our inquiry. The first is that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " Id. at 648, 106 S.Ct. at 1418 (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)); see Transit Mix Concrete Corp. v. Local Union No. 282, International Brotherhood of Teamsters, 809 F.2d 963, 967 (2d Cir.1987).
 
 
 19
 The second is that the question of arbitrability--i.e., whether the parties have agreed to submit a particular dispute to arbitration--"is undeniably an issue for judicial determination." AT & T Technologies, 475 U.S. at 649, 106 S.Ct. at 1418; see Transit Mix Concrete, 809 F.2d at 967. This principle "follows inexorably from the first" because a duty to arbitrate a particular grievance can stem only from a contractual agreement to arbitrate, and a determination of the scope of such a contractual term is peculiarly within the purview of the judiciary. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964) ("[t]he duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty").
 
 
 20
 The third principle is that courts should not stray into the merits of the underlying grievance. See AT & T Technologies, 475 U.S. at 649-50, 106 S.Ct. at 1418-19; Transit Mix Concrete, 809 F.2d at 967-68. "[E]ven if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator." AT & T Technologies, 475 U.S. at 649-50, 106 S.Ct. at 1419; see Emery Air Freight Corp. v. Local Union 295, 786 F.2d 93, 96 (2d Cir.1986).
 
 
 21
 Finally, where the collective bargaining agreement contains an arbitration clause, there is a "presumption of arbitrability." AT & T Technologies, 475 U.S. at 650, 106 S.Ct. at 1419. In other words, " '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' " Id. (quoting Warrior & Gulf Navigation, 363 U.S. at 582-83, 80 S.Ct. at 1353). This "presumption of arbitrability" flows from the national labor policy favoring arbitration in labor disputes because it promotes labor peace and avoids the more volatile remedies of strikes and lock-outs. See Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364, 371-72, 104 S.Ct. 1844, 1848-49, 80 L.Ed.2d 366 (1984); Warrior & Gulf Navigation, 363 U.S. at 577-78, 80 S.Ct. at 1350. As such, "[w]e will order arbitration if the arbitration clause is broad and if the party seeking arbitration has made a claim that on its face is governed by the contract, even if the claim appears to be frivolous." Associated Brick Mason Contractors, Inc. v. Harrington, 820 F.2d 31, 35 (2d Cir.1987).
 
 
 22
 There can be no argument that the Regional Agreement contains a broad arbitration clause, binding on both Local 807 and Regional. Specifically, the Regional Agreement provides for arbitration of "any controversy which might arise" between the parties. We are hard-pressed to think of a more sweeping arbitration clause. Clearly, the contract contemplates that disputes over layoffs caused by purported work transfers are to be arbitrated.
 
 
 23
 Regional maintains, however, that notwithstanding the sweep of the arbitration clause, Local 807's claims are not arbitrable. Regional argues that Judge Spatt properly applied the doctrine of collateral estoppel to the Board's finding that Local 807's conflict of interest precluded deferral to arbitration, and that a decision by the Board not to defer to arbitration because of a conflict of interest actually precludes arbitration. We disagree.
 
 
 24
 The doctrine of collateral estoppel may, of course, apply to the relitigation in a court of prior findings by the Board. See United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966); Woodlawn Cemetery v. Local 365, Cemetery Workers, 930 F.2d 154, 156 n. 2 (2d Cir.1991). A court, however, should not be too quick to conclude that the Board has finally resolved an issue thereby insulating it from relitigation. Thus, on a motion to compel arbitration, collateral estoppel will extend only to those issues that the Board has decided impose insuperable barriers to arbitration. See Hudson-Berlind Corp. v. Local 807, 597 F.Supp. 1282, 1286-87 (E.D.N.Y.1984) (Board's determination that there was no employer/employee relationship at time grievance arose was entitled to collateral estoppel effect and precluded arbitration of the grievance). We must therefore consider whether the Board's refusal to defer to arbitration is a valid ground for precluding arbitration. If it is not, we must then determine whether the Board's finding of a conflict of interest would itself serve to preclude arbitration.
 
 
 25
 Is the Board's refusal to defer to arbitration the equivalent of an order that arbitration not go forward? We think not. An understanding of the Board's deferral policy is necessary. In certain circumstances, the Board will refrain from exercising its exclusive jurisdiction to determine unfair labor practices because those grievances may be resolved more expeditiously in an arbitral proceeding. See United Technologies Corp., 268 N.L.R.B. 557 (1984) (citing Collyer Insulated Wire, 192 N.L.R.B. 837 (1971)). The Board has broad discretion to stay its hand and defer to the dispute resolution procedures established by the parties in their collective bargaining agreement. Carey v. Westinghouse Electric Corp., 375 U.S. 261, 264-66, 84 S.Ct. 401, 405-06, 11 L.Ed.2d 320 (1964). In cases such as this one, the Board's policy is to defer when, inter alia, (1) all the issues in the unfair labor practice proceeding are suitable for resolution by arbitration, (2) the employer has agreed to pursue arbitration, and (3) the interests of the union are not contrary to those of the affected employees. See United Technologies, 268 N.L.R.B. at 558-60; General American Transportation, 228 N.L.R.B. 808, 817 (1977) (Members Penello and Walther, dissenting). Generally, if any one of these three conditions is absent from a particular case, the Board will not defer.
 
 
 26
 Here the Board refused to defer to arbitration for several stated reasons: the Union's conflict of interest, Regional had not agreed to arbitrate, and not all the unfair labor practice issues would be resolved in an arbitral proceeding. The district court extrapolated from all this that the Board's decision not to defer to arbitration was the equivalent of a finding that the grievances were not arbitrable as a matter of law. We find this conclusion unwarranted.
 
 
 27
 Collateral estoppel precludes arbitration only if the previously-decided issue would, in and of itself, be a valid reason to preclude arbitration. See Hudson-Berlind Corp., 597 F.Supp. at 1286-87. The Board's decision that it would not defer to arbitration is not--and was never intended to be--a final determination by the Board that the controversy was not arbitrable as a matter of law. As stated, the Board may refuse to defer for numerous reasons, many of them based on Board policy. Such policy-rooted determinations do not necessarily bar arbitration as a matter of law.
 
 
 28
 If the Board's discretionary refusal to defer to arbitration had the collateral effect of precluding arbitration, the Board would assume control over the parties' right to pursue their contractual remedies. Section 301 of the Labor Management Relations Act, however, provides the courts with jurisdiction to resolve contractual claims that happen also to be the subject of unfair labor practice charges. See Carey, 375 U.S. at 271-72, 84 S.Ct. at 408-09; Smith v. Evening News Ass'n, 371 U.S. 195, 197-98, 83 S.Ct. 267, 268-69, 9 L.Ed.2d 246 (1962). Thus, the Board's exercise of its jurisdiction does not prevent courts from exercising their jurisdiction.
 
 
 29
 Defendants argue that the district court was bound at least by the reasons the Board gave for refusing to defer to arbitration. They contend, therefore, that arbitration is barred by the Board's finding that Local 807 had a conflict of interest. While the district court seems to have agreed with this argument, we are not persuaded by it. The Board referred to the conflict of interest as being "germane to [Local 807's] capacity to fairly represent the grievants." ALJ's Decision at 50. The "apparent conflict" between the interests of the Regional and Newport employees, which were both represented by Local 807, was merely one reason why the Board refused to defer to arbitration.[2] The Board never concluded that this "apparent conflict", in and of itself, precluded arbitration.
 
 
 30
 More importantly, the present circumstances differ from those that existed when the matter was before the Board, and do not indicate that Local 807 will be unable to represent fairly the apparently conflicting interests of the Regional and Newport employees. The conflict of interest presented to the Board involved allegations that Local 807 had aligned itself with Newport against the Regional employees. Presently, however, Local 807 seeks from the arbitrators an award of backpay for both the Regional and Newport employees; it does not seek to replace the Newport employees with Regional employees. All of the displaced Regional employees have been reinstated. Additionally, even assuming the taint of some conflict, the parties have agreed to establish a procedure at the arbitration proceeding that will allow Sanches' attorney to participate fully; and, we have full faith in the ability of the arbitrators to avoid any conflict. Thus, there is no persuasive claim that the employees' interests will not be fully protected.
 
 
 31
 We are aware that under certain circumstances, a determination that a union has breached its duty of fair representation may allow an employee either to bypass the arbitration process completely or to have any resulting arbitration award vacated. For instance, in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court held that a union's failure to process an employee's grievances allowed the employee to bypass the contractually-mandated arbitration provision and immediately file a Section 301 suit in the district court. Id. at 186, 87 S.Ct. at 914. In Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), the Court expanded on Vaca and held that where an arbitration award against the employee results from the union's inexcusable failure to discover and present evidence--evidence that clearly would have resulted in a contrary award--the arbitration award may be vacated and the employee may pursue his contractual claims in the district court. Id. at 568-71, 96 S.Ct. at 1058-59.
 
 
 32
 We do not read these cases to bar arbitration of an employee's contractual claims every time the union, by failing to process employee grievances, has breached its duty of fair representation. In a case such as this one, Vaca teaches that the employees would have the option to bypass the arbitration procedure and look to the court to enforce their contractual rights, were they to so choose. Vaca, 386 U.S. at 186, 87 S.Ct. at 914. The employees here have chosen to allow Local 807 to pursue their contractual rights via the arbitration procedure. They do not seek to circumvent the contractual grievance procedure because of Local 807's prior breach of its duty. Thus, there can be no claim that any resulting arbitration award will be invalid merely because of the Union's prior breach of its duty of fair representation.
 
 
 33
 Application of the Regional Agreement to Newport
 
 
 34
 Local 807 argues that if we conclude that the present grievances are arbitrable, this case should be remanded to the district court to determine whether Newport is the alter ego of Regional and thus bound by the arbitration clause of the Regional Agreement. Newport claims, however, that it never agreed to arbitrate under the Regional Agreement and, furthermore, that the Board's decision prohibits the application of the Regional Agreement to Newport because the decision implicitly holds that the employees of Regional and Newport are not a single bargaining unit. Newport argues that before it may be bound by the terms of a contract it did not sign, there must be a finding that Regional and Newport are a single employer and a finding that the employees of both Regional and Newport constitute a single bargaining unit. Newport claims that because the Board's holding precludes a finding of a single bargaining unit, Newport cannot be bound to the Regional Agreement. We are not persuaded for two reasons.
 
 
 35
 First, we disagree with Newport's bald assertion that the Board's decision implicitly holds that the Newport and Regional employees are necessarily separate bargaining units. The Board held that neither Local 807 nor Newport committed an unfair labor practice by entering into a collective bargaining agreement even though Local 807 had not previously attained proper recognition as the exclusive bargaining agent of the Newport employees. It is clear to us that the Board's reasoning was based on its contemporaneous holding that Newport was the alter ego of Regional, rather than on some unarticulated assumption that the employees of Newport were a separate bargaining unit. Indeed, the Board had no reason to consider this single-unit question because there was no charge in the NLRB proceeding that the Newport employees had been discriminated against. Thus, contrary to Newport's contention, we believe the Board has not definitively asserted its jurisdiction to decide this single employer/single bargaining unit issue. See South Prairie Constr. Co. v. International Union of Operating Engineers, 425 U.S. 800, 804-806, 96 S.Ct. 1842, 1844-45, 48 L.Ed.2d 382 (1976) (per curiam) (court usurped authority of NLRB by deciding "single unit" question where NLRB had asserted jurisdiction but never reached the question because of erroneous preliminary finding that employers were not a "single employer").
 
 
 36
 Second, and more importantly, Newport's suggestion that the Board has conclusively determined that the two groups of employees are not a single bargaining unit, thus precluding the application of the Regional Agreement to Newport, blithely ignores the Board's finding that Newport was the alter ego of Regional. The alter ego doctrine provides an analytical hook to bind a non-signatory to a collective bargaining agreement. See Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942); Goodman Piping Products, Inc. v. NLRB, 741 F.2d 10, 11-12 (2d Cir.1984) (per curiam). The alter ego doctrine, while having the same binding effect on a non-signatory as the single employer/single unit doctrine, is conceptually distinct. See Local One Amalgamated Lithographers v. Stearns & Beale, Inc., 812 F.2d 763, 772 (2d Cir.1987); Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc., 690 F.2d 489, 507-508 (5th Cir.1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). In Pratt-Farnsworth, the Fifth Circuit stated that the focus of "the alter ego doctrine, unlike that of the single employer doctrine, is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." Id. at 508. The hallmarks of the alter ego doctrine include "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." Goodman Piping, 741 F.2d at 11.
 
 
 37
 We find nothing in the Board's decision that would preclude a determination that Newport is the alter ego of Regional and therefore bound by the arbitration clause of the Regional Agreement. In fact, Newport's argument approaches frivolity in light of the Board's specific finding that Newport is the alter ego of Regional. We note that the Board determined that "for the purposes of [the NLRB] proceeding," Newport was the alter ego of Regional. Because the district court erroneously concluded that the present claims were not arbitrable, it never had to resolve the alter ego issue.
 
 Potential Conflict with Board Remedy
 
 38
 Finally, defendants maintain that arbitration is either improper because any remedy will necessarily conflict with the Board's remedial order, or unnecessary because it will simply track the Board's order. We disagree. The Board's remedial order affords no relief to the Newport employees, who were forced to perform the transferred unit-work at lower rates of pay. More importantly, however, neither of these arguments persuades us because both necessarily lure us into the merits of the grievances. As previously stated, our task is to determine only whether the grievances are arbitrable, not whether they are meritorious. See AT & T Technologies, 475 U.S. at 649, 106 S.Ct. at 1419; Emery Air Freight, 786 F.2d at 96-97. The mere possibility that the eventual arbitration award may conflict with the Board's ruling is not a cognizable basis for refusing to compel arbitration. See Transit Mix Concrete, 809 F.2d at 969 n. 3.
 
 CONCLUSION
 
 39
 We find that the district court improperly held that the present grievances were not arbitrable. We remand for the district court to compel arbitration and to determine whether Newport is bound by the arbitration clause of the Regional Agreement.
 
 
 40
 Reversed and Remanded.
 
 
 
 [1]
 As previously stated, Local 807 did not move for summary judgment against Newport because it took the position that the district court first had to hold a hearing on whether Newport was bound by the Regional Agreement
 
 
 [2]
 One of the other reasons for refusing to defer to arbitration was that arbitration would not have resolved all of the unfair labor practice charges. The ALJ noted that "on that ground alone deferral is unwarranted." This suggests that the other stated reasons for refusing to defer--e.g., conflict of interest--were not necessary to the Board's decision, and, therefore, as to those other reasons, collateral estoppel would be inappropriate. See Restatement (Second) of Judgments § 27 comment h