DEAN WITTER REYNOLDS, INC., and
David Rodriguez, Plaintiffs,

v.

Bonifacio SÁNCHEZ ESPADA, and
Mirna López de Sánchez,
Defendants.

Civil No. 96–1393(DRD).

United States District Court,
D. Puerto Rico.

Feb. 22, 1997.

---

Nestor Mendez–Gomez, Pietrantoni Mendez & Alvarez, Hato Rey, P.R., for plaintiffs.

Harold D. Vicente–Gonzalez, Vicente & Cuevas, Santurce, P.R., for defendants.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Defendants Bonifacio Sánchez Espada and Mirna López de Sánchez ("Mr. and Mrs. Sánchez") instituted arbitration proceedings before the New York Stock Exchange against plaintiffs Dean Witter Reynolds, Inc. and David Rodríguez (collectively, "Dean Witter") for alleged violations of federal securities laws and Puerto Rico securities, tort, and contract laws. Dean Witter then filed the instant action, inviting the Court to permanently stay and dismiss the arbitration proceedings currently pending before the New York Stock Exchange. For the reasons discussed below, the Court denies the relief requested by the plaintiffs.

### I. Background

Mr. and Mrs. Sánchez, both in their fifties and now retired, were in the funeral home business for thirty years, by the end of which they owned three funeral homes. In 1993, they sold their interest in their business to a corporation that owns a chain of funeral homes for approximately $2,600,000. Mr. and Mrs. Sánchez placed the proceeds of the sale in three brokerage accounts opened at co-plaintiff Dean Witter Reynolds, Inc.'s San Juan, Puerto Rico office.[1] The account appli-

---

1. Co-plaintiff Mr. David Rodríguez, a securities broker employed by Dean Witter at its San Juan office, was the account executive in charge of the Sánchezes' accounts. In their own words, Dean

cations that Mr. and Mrs. Sánchez signed incorporated the terms of the "Dean Witter Client Agreement," a standard-form contract governing all securities, Active Assets, and margin loan accounts at Dean Witter.

The Dean Witter Client Agreement contained a general choice-of-law clause stating that "[t]his Agreement aid its enforcement will be governed by the law of the State of New York without regard to conflicts of laws provisions." Furthermore, the section of the Client Agreement dealing with Margin Privileges contained an arbitration clause as well as a second choice-of-law clause, the relevant text of which reads as follows:

### Arbitration of Controversies

You agree that all controversies between you or your principals or agents and Dean Witter or its agents (including affiliated corporations) arising out of or concerning any of your accounts, orders or transactions, or the construction, performance, or breach of this or any other agreement between us, whether entered into before or after the date an account is opened, shall be determined by arbitration only before the New York Stock Exchange, Inc.; the National Association of Securities Dealers, Inc.; or the Municipal Securities Rulemaking Board, as you may elect. . . .

Unless the rules of the arbitral forum dictate otherwise, any arbitration proceeding between us shall be held at a location at which the selected forum regularly conducts such proceedings nearest to the Dean Witter office carrying your accounts at the time the claim arose; this venue shall apply even if you have related disputes with other parties which cannot be resolved in the same locale. Except for simplified proceedings (small claims), any arbitration proceeding between us shall be heard and decided by a panel of not fewer than three arbitrators.

*The law of the State of New York will apply in all respects, including but not limited to determining of applicable statutes of limitation and available remedies.* The award of the arbitrator or a majority of them shall be final, and judgement on the award may be entered in any state or federal court having jurisdiction.

Dean Witter Client Agreement (eff. June 15, 1994) (emphasis added).

Pursuant to the allegations made by Mr. and Mrs. Sánchez, they invested on Mr. Rodríguez' advice or direction approximately $2,000,000 in shares of InterCapital Quality Municipal Securities, and $225,000 in shares of TCW/DW Term Trust 2000. Both securities were issued by affiliates of Dean Witter Reynolds, Inc. The InterCapital shares were sold within seven months at a loss of approximately $510,000. The Term Trust shares were sold within four months at a loss of approximately $29,000. Subsequently, Dean Witter issued Mr. and Mrs. Sánchez a margin loan of approximately $1,800,000, which amount was invested in U.S. Treasury Bonds. The bonds were later resold for an aggregate loss of approximately $145,000. Mr. and Mrs. Sánchez also allege that some or all of these transactions were carried out without their consent.

On January 2, 1996, Mr. and Mrs. Sánchez filed a statement of claim before the New York Stock Exchange submitting for arbitration their dispute against Dean Witter and David Rodríguez. Mr. and Mrs. Sánchez claim that Dean Witter and Mr. Rodríguez made investments with their money which were wholly unsuitable to their investment objectives. In making such investments, Mr. Rodríguez, and through him, Dean Witter,

Witter and Mr. Rodríguez state that "On September 3, 1993, Claimants met with Mr. Rodríguez to discuss investment possibilities for the proceeds they received from the sale of their funeral home business. After a complete orientation as to investment possibilities, and on the use of margin privileges, Claimants opened three separate investment accounts with Dean Witter, to wit: an individual account under the name of Mr. Sánchez, an individual account under the name of Mrs. Sánchez, and a joint account. In the [a]ggregate, Claimants deposited in the three accounts the total of $2,600,000, amount which they received from the referenced sale of their funeral home business. Of the total amount, . . . $1,000,000 were deposited in each of the individual accounts, and the remaining $600,000 were placed in the joint account. The amount deposited in the joint account would be used to satisfy several liabilities Claimants assumed in connection with the sale of their business and to make several payments to the Treasury Department and the Internal Revenue Service." Docket No. 1 at 2–3.

allegedly violated of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78, and Rule 10b–5 of the Securities and Exchange Commission, as well as the Puerto Rico securities, tort, contract, and organized crime laws.

On April 1, 1996, the plaintiffs filed the instant suit, seeking an order from this Court staying the arbitration proceedings and dismissing the Sánchezes' claims on statute of limitations grounds (Docket No. 1). Dean Witter and Mr. Rodríguez argue that:

> [t]he laws of the State of New York, which govern the existing Client Agreement between the parties, allow this Court to dismiss the referenced claims on statute of limitations grounds before the claims are submitted to arbitration proceedings. The claims herein raised under the Federal Securities Laws and the Laws of Puerto Rico are time-barred under the appropriate statutes of limitations and thus, should be dismissed for Claimants lack a valid cause of action upon which relief may be granted.

Motion to Stay Arbitration Proceedings, Docket No. 1 at 2.

After various procedural incidents, the Court set the parties' motions for oral argument and ordered the temporary stay of the arbitration proceedings pending the Court's resolution of the motion to dismiss (Docket Nos. 17, 22). At a hearing held on September 9, 1996, the parties discussed the applicability to the case at hand of a recent decision by the U.S. Court of Appeals for the First Circuit, *PaineWebber, Inc. v. Elahi*, 87 F.3d 589 (1st Cir.1996). The matter now stands submitted.

## II. Jurisdiction

■■■] The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–14, "is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal question jurisdiction under 28 U.S.C. § 1331." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983). *See also Southland Corp. v. Keating*, 465 U.S. 1, 15 n. 9, 104 S.Ct. 852, 861 n. 9, 79 L.Ed.2d 1 (1984). A suit to compel arbitration under the FAA may therefore be brought in federal district court "only when the court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis of federal jurisdiction before the order can issue." *Moses H. Cone Memorial Hospital*, 460 U.S. at 25 n. 32, 103 S.Ct. at 942 n. 32. Jurisdiction in this case cannot be premised on 28 U.S.C. § 1332, for complete diversity of citizenship between the parties is lacking. However, because the underlying dispute involves claims under the Securities and Exchange Act, 15 U.S.C. § 78, the Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the federal securities claims. In addition, the Court enjoys supplemental jurisdiction over the underlying state-law claims because they are so related to the federal securities law claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

## III. Analysis

The fundamental question in this case is whether this Court may rule on Dean Witter's statute of limitations defenses, or whether the adjudication of such defenses belongs to the arbitrator, instead. Dean Witter argues that, by choosing New York law in the Client Agreement, the parties "adopted as binding New York's rule that threshold Statute of Limitations questions are for the courts." Docket No. 1 at 6 (quoting *In the matter of Smith, Barney, Harris, Upham & Co. v. Luckie*, 85 N.Y.2d 193, 623 N.Y.S.2d 800, 647 N.E.2d 1308 (C.A.N.Y.1995)).[2] Mr. and Mrs. Sánchez re-

---

**2.** The reference to "New York's rule", which permits parties opposing arbitration to raise in court any statute of limitations defenses they might have rather than wait to have the arbitrators decide them, is actually to New York Civil Practice Law and Rules 7502(b) and 7503(a). N.Y. C.P.L.R. 7502(b) provides, in pertinent part:

> If, at the time that a demand for arbitration was made or a notice of intention to arbitrate was served, the claim sought to be arbitrated would have been barred by limitation of time

spond that the choice of law clause is not so clear as to overcome the presumption that statute of limitations questions are arbitrable.

## A. The Federal Arbitration Act

### 1. Same footing for arbitration clauses

Section 2 of the Federal Arbitration Act provides, in pertinent part:

> A written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract.

9 U.S.C. § 2 (emphasis added). Congress enacted the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–220, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985), and to place arbitration agreements "upon the same footing as other contracts," *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974). *See also Allied–Bruce Terminix Companies v. Dobson*, 513 U.S. 265, 270–72, 115 S.Ct. 834, 838–840, 130 L.Ed.2d 753 (1995).

In the view of Congress, the traditional judicial hostility to arbitration was uncalled for, given that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995). Furthermore, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than in a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). As the Supreme Court once remarked, "[a]n agreement to arbitrate before a specialized tribunal is 'in effect, a specialized kind of forum-selection clause,' that posits not only the situs of the suit but also the procedure to be used in resolving the dispute." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974) (citing *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972)).[3]

The language of Section 2 of the FAA is couched in imperative terms. "In enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states[4] to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984). *See also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 224–225, 105 S.Ct. 1238, 1244–1245, 84 L.Ed.2d 158 (1985) (Courts must compel arbitration if FAA requirements met, even when result is bifurcation of proceedings). "Contracts to arbitrate are not to be avoided by allowing one party to ignore the contract and resort to the courts. Such a course could lead to prolonged litigation, one of the very risks the

---

had it been asserted in a court of the state, *a party may assert the limitation as a bar to the arbitration on an application to the court ....* The failure to assert such bar by such application shall not preclude its assertion before the arbitrators, who may, in their sole discretion, apply or not apply the bar. (Emphasis added).

Similarly, N.Y. C.P.L.R. 7503(a) provides:

> A party aggrieved by the failure of another to arbitrate may apply for an order compelling arbitration. Where there is no substantial question whether a valid agreement was made or complied with, and the claim sought to be arbitrated is not barred by limitation under subdivision (b) of section 7502, the court shall direct the parties to arbitrate. Where any such

question is raised, it shall be tried forthwith in said court.

3. Indeed, in *Scherk*, 417 U.S. at 519, 94 S.Ct. at 2457, the Supreme Court analogized the statutory policy favoring arbitration to the judicial policy that "a forum clause should control absent a strong showing that it should be set aside," announced in *The Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916.

4. Because the FAA was promulgated under Congress' power under the Commerce Clause, it is applicable in state as well as federal courts. *Southland Corp. v. Keating*, 465 U.S. 1, 12, 104 S.Ct. 852, 859, 79 L.Ed.2d 1 (1984).

parties, by contracting for arbitration, sought to eliminate." *Southland Corp. v. Keating,* 465 U.S. 1, 7, 104 S.Ct. 852, 856, 79 L.Ed.2d 1 (1984).

The practical effect of § 2 of the FAA is to ensure that arbitration agreements are treated no differently than any other private contractual agreements, notwithstanding any state statutes or judicial decisions to the contrary. On this matter the Supreme Court has written that:

States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of any contract.' ... What States may *not* do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit) but not fair enough to enforce its arbitration clause. The [FAA] makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the [FAA's] language and Congress's intent.

*Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 843, 130 L.Ed.2d 753 (1995) (emphasis added). Similarly, the Supreme Court has stated that:

State law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the text of § 2 of the FAA].... A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot.

*Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987) (italics in original; underlined emphasis added). Therefore,

Absent a well-founded claim that an arbitration agreement resulted from the sort of fraud or excessive economic power that would provide grounds for the revocation of any contract, ... the [FAA] provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability.

*Shearson/American Express v. McMahon,* 482 U.S. 220, 227, 107 S.Ct. 2332, 2337–2338, 96 L.Ed.2d 185 (1987).

2. Presumptions and arbitrability

As discussed above, "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the act." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). "The Act, however, does not define what grounds for revocation may be permissible, and hence it would appear that the judiciary must fashion the limitations as a matter of federal common law." *Southland Corp. v. Keating,* 465 U.S. 1, 19, 104 S.Ct. 852, 862, 79 L.Ed.2d 1 (1984) (Stevens, J., concurring in part and dissenting in part).

A federal common law of arbitrability has arisen to guide federal courts in determining whether to enforce arbitration agreements, based on the fundamental principle that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration," *First Options,* 514 U.S. at 943, 115 S.Ct. at 1924. Most generally, agreements to arbitrate are "generously construed." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353–3354, 87 L.Ed.2d 444 (1985). In keeping with this general presumption,

Questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Moses H. Cone Memorial Hosp.*, 460 U.S. at 24–25, 103 S.Ct. at 941–942. The Supreme Court has therefore set forth a more specific presumption of arbitrability:

· It has been established that where a contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

*AT & T Technologies, Inc. v. Communications Workers of America, Inc.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (citing *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)).[5] This presumption has recently been recast as follows: "Due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60–61, 115 S.Ct. 1212, 1218, 131 L.Ed.2d 76 (1995).

■ However, this presumption that a dispute is arbitrable extends only to disputes on the merits. In contrast, the federal law of arbitrability has developed a countervailing presumption that the courts should decide questions of arbitrability; that is, disputes as to whether the parties entered into an arbitration agreement in the first place. In that regard, the Supreme Court has written that:

When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts.... The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration....

This Court, however, has (as we just said) added an important qualification, applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clea[r] and unmistakabl[e]" evidence that they did so.[6] ... In this manner, the law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement"—for in respect to this latter question the law reverses the presumption.

*First Options of Chicago v. Kaplan*, 514 U.S. 938, 944–45, 115 S.Ct. 1920, 1924–25, 131 L.Ed.2d 985 (1995) (citations omitted). Timeliness defenses, including statutes of limitations defenses, do not normally present questions of arbitrability. *PaineWebber, Inc. v. Elahi*, 87 F.3d 589, 597 (1st Cir.1996). The same conclusion can be derived, in the federal labor law context, from the distinction between substantive and procedural arbitrability. *Local 285 Service Employees International Union, AFL–CIO v. Nonotuck Resource Associates. Inc.*, 64 F.3d 735, 739 (1st Cir.1995) (Torruella, Ch.J.) ("Thirty years of Supreme Court and federal circuit court precedent have established that issues

**5.** Although the presumption of arbitrability was originally developed in cases dealing with labor arbitration, it has since been extended to cover all other cases under the FAA. *First Options of Chicago v. Kaplan*, 514 U.S. 938, 944–45, 115 S.Ct. 1920, 1924–25, 131 L.Ed.2d 985 (1995).

**6.** The Court was referring to its earlier decision in *AT & T Technologies, Inc. v. Communications Workers of America, Inc.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–1419, 89 L.Ed.2d 648 (1986).

concerning the timeliness of a filed grievance are 'classic' procedural questions to be decided by an arbitrator").

### B. Arbitration Law, Choice of Law, and the Dean Witter Client Agreement

As the discussion above indicated, unless there is clear evidence that the parties agreed to arbitrate questions of arbitrability, a court must decide whether or not the parties entered into a valid agreement to arbitrate. In the case at hand, because there is no evidence that the parties agreed to submit the issue of arbitrability to arbitration, the question of the validity and enforceability of the arbitration agreement is for the Court. Furthermore, because neither party disputes the validity of the Client Agreement as a whole, and of the arbitration clause in particular, and because there is no evidence suggesting that fraud or duress was employed by either party, there is no doubt that the Client Agreement was valid. "[T]he signing of a valid agreement to arbitrate the merits of the subject matter in dispute presumptively pushes the parties across the 'arbitrability' threshold; we will then presume that other issues relating to the substance of the dispute or the procedures of arbitration are for the arbitrator." *PaineWebber, Inc. v. Elahi*, 87 F.3d at 599.

As a preliminary matter, the Court notes that had New York law been generally applicable to this case (not because of a choice of law clause but, for example, because the parties resided in New York and the contract had been entered into in New York), the New York rule on the arbitrability of statute of limitations defenses would have been inapplicable. First, it is doubtful whether state rules of civil procedure should generally be applicable to suits to compel arbitration brought in federal court under § 2 of the FAA. Second, and more importantly, the New York rule allocating decision-making authority between courts and arbitrators is "[a] state-law principle that takes its meaning precisely from the fact that a contract *to arbitrate* is at issue" which "does not comport with" and is therefore preempted by § 2 of the FAA. *Perry v. Thomas*, 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9. It thus follows, as the New York Court of Appeals conceded, that "[u]ndeniably, *in the absence of an explicit choice of law provision,* governing Federal law would have precluded the courts in the appeals before us from addressing the Statute of Limitations issue ... or from issuing stays under our arbitration act." *In the matter of Smith, Barney, Harris, Upham & Co. v. Luckie*, 85 N.Y.2d 193, 202, 623 N.Y.S.2d 800, 647 N.E.2d 1308 (C.A.N.Y.1995) (emphasis added) (citing *Conticommodity Servs. v. Philipp & Lion*, 613 F.2d 1222, 1224–1225 (2d Cir. 1980)).

However, the parties in this case entered into a client agreement which contained two choice-of-law clauses as well as an arbitration clause. As discussed above, unless there is clear evidence that the parties agreed to have a court decide particular disputes on the merits, such as statute of limitations defenses, it is presumed that a court must order the arbitration of such disputes. Given the validity of the Dean Witter Client Agreement as a whole, the question is therefore whether the choice-of-law provisions contained in the Client Agreement provide "clear and unmistakable evidence" that the parties agreed to reverse the usual presumption and "adopt[ ] as binding New York's rule that threshold Statute of Limitations questions are for the courts." Docket No. 1 at 6 (quoting *In the matter of Smith, Barney, Harris, Upham & Co. v. Luckie*, 85 N.Y.2d at 202, 623 N.Y.S.2d 800, 647 N.E.2d 1308).

"State law may be applied [to arbitration agreements] 'if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'" *Doctor's Associates, Inc. v. Casarotto*, —— U.S. ——, ——, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987)). Given that the parties have selected New York law in the Client Agreement, the Court will rely on New York contract law to interpret the Client Agreement. *See also PaineWebber, Inc. v. Elahi*, 87 F.3d at 600.

Pursuant to long-established New York law, "[i]f [a contract] was ambiguous because it did not state [a term] explicit-

ly, then its terms must be strictly construed against the drafter." *Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 460, 541 N.Y.S.2d 742, 539 N.E.2d 570 (1989).[7] The New York Court of Appeals explicitly relied on the Restatement of Contracts, which provides at Section 206: "In choosing among reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." Restatement (Second) of Contracts § 206 (1981). *See also Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 348, 126 N.E.2d 271 (1955) (relying on the "well-settled maxim that, where there is ambiguity in the terms of a contract prepared by one of the parties, it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against such party.") (citations omitted). Pursuant to New York contract law, a contract is ambiguous when its terms are reasonably susceptible to two or more interpretations. *Diodato v. Eastchester Development Corp.*, 111 A.D.2d 303, 489 N.Y.S.2d 293, 294 (2d Dept.1985). *See also PaineWebber, Inc. v. Elahi*, 87 F.3d at 600; *In re Kam Kuo Seafood Corp.*, 76 B.R. 297 (Bankr.S.D.N.Y. 1987).

The maxim that ambiguous terms should be interpreted against the drafter is clearly applicable to the case at hand, where Dean Witter drafted the terms of the Client Agreement without any input from Mr. and Mrs. Sánchez.[8] Furthermore, the choice of New York law clause contained within the Client Agreement's arbitration clause was ambiguous as to the applicability of N.Y. C.P.L.R. §§ 7502(b) and 7503(a). The arbitration clause provided, on the one hand, that:

all controversies … arising out of or concerning any of your accounts, orders or transactions, or the construction, performance, or breach of this … agreement, shall be determined by arbitration only before the [N.Y.S.E.],

but on the other hand, that:

[t]he law of the State of New York will apply in all respects, including but not limited to determination of applicable statutes of limitation and available remedies.

Dean Witter argues that the latter provision is susceptible of only one reasonable interpretation; namely, that that New York rule of procedure allowing courts to decide issues of statutes of limitation is a "New York law … [regarding] determination of applicable statutes of limitation and applicable remedies." In particular, Dean Witter suggests that the presence of a choice-of-law clause within the arbitration agreement should lead the Court to conclude that the clause was included in order to ensure that New York's laws and rules relating to arbitration would be applicable.

The Court disagrees. The presence of a choice-of-law clause within the arbitration agreement is not the tell-tale sign that Dean Witter supposes. To the contrary, given the fact that Dean Witter saw the need for including two choice-of-law clauses in the same Client Agreement, the second choice-of-law clause may reasonably be given a different interpretation. The first such clause covers those Client Agreements pursuant to which the clients have not been granted margin trading privileges. Dean Witter clients desiring such privileges are required to enter into an additional agreement that specifically covers such trades. The arbitration clause appears only in this additional agreement; clients not entering into a margin trading agreement are not required to arbitrate their disputes with Dean Witter. For those who do enter into a margin trading agreement,

---

**7.** The United States Supreme Court itself has noted that "the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it" is part of the law of contracts in New York. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76 (1995) (citing *Graff v. Billet*, 64 N.Y.2d 899, 902, 487 N.Y.S.2d 733, 477 N.E.2d 212 (1984) and the Restatement (Second) of Contracts § 206 (1979)).

**8.** "The rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position, but it is not limited to such cases." Restatement (Second) of contracts § 206 cmt. a (1981).

however, the arbitration clause extends over the entire Client Agreement—("all controversies ... arising out of ... the ... breach of this or any other agreement between us ... shall be determined by arbitration ...")—and supplants any inconsistent language in other parts of the Client Agreement.

It may thus reasonably be presumed that the second choice-of-law clause was included in order to guarantee that New York law would still be applicable in arbitration. It may also be inferred that the choice-of-law clause, by specifying that the law of New York as to statutes of limitation would be applicable, was designed to ensure that New York substantive law as to statutes of limitation would be applied by the arbitrators. In contrast, a clause merely providing for the general application of New York law would have been ambiguous as to whether the arbitrator should apply the law of New York as to statutes of limitations, the arbitral forum's rules regarding limitations periods, or both. Indeed, it is Dean Witter's interpretation of the choice of law clause that seems strained, particularly given the general disclaimer included at the head of the arbitration agreement: "b. The parties are waiving their right to seek remedies in court, including the right to jury trial." Dean Witter chose remarkably murky language with which to "make clear" that it intended the courts to have a first bite at the statutes of limitations apple.

■ In sum, both New York contract law and the federal law of arbitrability militate against interpreting the Client Agreement as Dean Witter urges the Court to. Federal law presumes that "allegations of waiver, delay, or a like defense to arbitrability," such as statutes of limitation defenses, are arbitrable, *Moses H. Cone Memorial Hosp.,* 460 U.S. at 24–25, 103 S.Ct. at 941–942, unless there is "clear and unmistakable" evidence to the contrary, *First Options of Chicago,* 514 U.S. at 945–46, 115 S.Ct. at 1925. The evidence proffered by Dean Witter was neither clear nor unmistakable, thus activating the presumption of arbitrability; that is, that statute of limitations defenses are arbitrable. In fact, the evidence was ambiguous, which in parallel fashion leads the Court to conclude,

against Dean Witter's contention, that the parties did not agree to have the courts decide "threshold questions of statutes of limitation."

## C. Objections and responses

Dean Witter's argument that the arbitration choice-of-law clause should be read to incorporate New York's arbitration rules relies heavily on two cases: *Luckie v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 85 N.Y.2d 193, 623 N.Y.S.2d 800, 647 N.E.2d 1308 (1995), and *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. Univ.,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Both are distinguishable.

First, the holding in *Luckie* rests upon a decision by the Seventh Circuit that was later reversed by the Supreme Court. The Court explains. The crucial factor in the Court of Appeal's decision that the trial court should have ruled upon the defendant's statute of limitations defenses was its conclusory determination that "when the parties chose to apply New York law, 'without excluding its arbitration rules' from that general condition, ... the parties adopted as binding New York's rule that threshold Statutes of Limitations questions are for the courts." *Luckie,* 85 N.Y.2d at 202, 623 N.Y.S.2d 800, 647 N.E.2d 1308. This factual determination was the key to the decision; the Court's subsequent statements, that such a contractual agreement was not preempted by the FAA, merely restated what was already clearly-established federal arbitration law.

In deciding that the parties had, *as a matter of fact,* incorporated the New York rule that questions of timeliness are for the courts, the New York Court of Appeals relied exclusively on a similar decision by U.S. Court of Appeals for the Seventh Circuit, *Mastrobuono v. Shearson Lehman Hutton,* 20 F.3d 713, 717 (7th Cir.1994) (holding that choice of New York law included New York's Garrity rule, which provides that arbitrators may not award punitive damages). Unfortunately for the New York Court's argument, the Seventh Circuit's decision was later reversed on precisely that ground. *Mastrobuono,* 514 U.S. at 56–57, 115 S.Ct. at 1216–

1217 (1995). The Supreme Court explained that the choice of New York law could reasonably be understood as a "substitute for ordinary conflict-of-laws analysis," and that, in any case, the choice of New York law need not entail the application of New York's law regarding "the allocation of power between courts and arbitrators". 514 U.S. at 60, 115 S.Ct. at 1217. This Court reaches a similar conclusion above at Part III.B.

Second, *Volt* is also unpersuasive, for its holding is limited to its facts. The majority's holding in *Volt* depended entirely upon its acceptance of one crucial but highly questionable factual finding made by the California Court of Appeals; namely, that the inclusion of a generic choice-of-law clause providing for the application of California law meant, without more, that the parties had intended to incorporate the California rules of arbitration into their arbitration agreement. Given the California court's finding of fact, the Supreme Court found that its hands were tied; "the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review." *Volt Information Sciences*, 489 U.S. at 474, 109 S.Ct. at 1253. Because "[a]rbitration is a matter of consent, not coercion," the Court held that although state procedural rules affecting arbitration are not normally applicable to suits under § 2 of the FAA, there was nothing to stop parties from contractually agreeing to make such rules applicable. *Id.* at 479, 109 S.Ct. at 1255–1256.

In the case at hand, however, we leave *Volt* to one side because we are not bound by prior factual determinations by another tribunal; like the First Circuit, "[h]ere, we must determine de novo what the parties intended by their choice-of-law clause, and we follow *Mastrobuono*." *PaineWebber, Inc. v. Elahi*, 87 F.3d 589, 594 n. 5 (1st Cir.1996).

IV. Conclusion

Dean Witter Reynolds, Inc. and David Rodríguez's various motions to stay arbitration proceedings and to dismiss as untimely the claims filed by Mr. and Mrs. Sánchez are **denied.** Accordingly, the temporary stay of arbitration ordered on July 19, 1996 (Docket No. 22), is hereby **vacated.** The Court orders that the instant case be dismissed and compels the parties to comply with their agreement to arbitrate by submitting all of their pending substantive claims, including any statute of limitations defenses, to arbitration before the New York Stock Exchange. Costs are to be awarded to defendants, Mr. and Mrs. Sánchez.

IT IS SO ORDERED.